## UNITED STATES *v.* GILES.

No. 329. Argued January 13, 1937.—Decided February 1, 1937.

*Assistant Attorney General McMahon,* with whom *Solicitor General Reed* and *Messrs. William W. Barron,* and *W. Marvin Smith* were on the brief, for the United States.

Citing, *inter alia, Morse* v. *United States,* 174 Fed. 539, cert. den., 215 U. S. 605; *Lewis* v. *United States,* 22 F. (2d) 760; *Richardson* v. *United States,* 181 Fed. 1; *McKnight* v. *United States,* 97 Fed. 208, 213; *United*

States v. *Fish,* 24 Fed. 585, 593–594. Cf. *United States* v. *Gooding,* 12 Wheat. 460, 469; *Commonwealth* v. *White,* 123 Mass. 430, 434; *Seifert* v. *State,* 160 Ind. 464, 466; *Maxey* v. *United States,* 30 App. D. C. 63, 74–75; *Rex* v. *DeMarny* [1907] 1 K. B. 388; *People* v. *Lewis,* 124 Cal. 551; *Thornton* v. *State,* 107 Ga. 683.

*Mr. Will A. Morriss,* with whom *Mr. Nat L. Hardy* was on the brief, for respondent.

Citing, *inter alia,* 12 U. S. C. 592; 18 U. S. C. 550; *United States* v. *McClarty,* 191 Fed. 518, 523; *United States* v. *Herrig,* 204 Fed. 124; *United States* v. *Booker,* 98 Fed. 291; *Twining* v. *United States,* 141 Fed. 41; *State* v. *Asal,* 79 Mont. 385; *United States* v. *Eqe,* 49 Fed. 852, 853.

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

Section 5209, R. S.,[1] as amended by Act Sept. 26, 1918, c. 177, 40 Stat. 967, 972 (U. S. C., Title 12, § 592) provides:

---

[1] Sec. 5209 R. S., Title LXII, National Banks, Ch. 3. "Every president, director, cashier, teller, clerk, or agent of any association, who embezzles, abstracts, or willfully misapplies any of the moneys, funds, or credits of the association; or who, without authority from the directors, issues or puts in circulation any of the notes of the association; or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment, or decree; or who makes any false entry in any book, report, or statement of the association, with intent, in either case, to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association; and every person who with like intent aids or abets any officer, clerk, or agent in any violation of this section, shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years nor more than ten."

"Any officer, director, agent, or employee of any Federal reserve bank, or of any member bank . . . who *makes* any false entry in any book, report, or statement of such Federal reserve bank or member bank, with intent in any case to injure or defraud such Federal reserve bank or member bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such Federal reserve bank or member bank, or the Comptroller of the Currency, or any agent or examiner appointed to examine the affairs of such Federal reserve bank or member banks, or the Federal Reserve Board . . . shall be deemed guilty of a misdemeanor, and upon conviction thereof in any district court of the United States shall be fined not more than $5,000 or shall be imprisoned for not more than five years, or both, in the discretion of the court."

Count three of an indictment in the United States District Court, Western District of Texas, charged that respondent Giles, while employed as teller by the Commercial National Bank of San Antonio, Texas, a member of the Federal Reserve National Bank of Dallas, did "unlawfully, knowingly, wilfully, fraudulently, and feloniously *make and cause to be made* in a book of the said The Commercial National Bank of San Antonio, Texas, known as the Individual Ledger, in the account designated 'S. A. Public Service Company,' under date of 'Jul 25 '33' in the column bearing the printed heading 'Balance,' being the fifth entry from the top of the column aforesaid, and directly opposite the machine printed date thereon 'July 25 33,' a certain false entry in the following figures, to wit, '7,874.07,' which said entry so made as aforesaid, purports to show and does in substance and effect indicate and declare that The Commercial National Bank of San Antonio, Texas, was indebted and liable to the San Antonio Public Service Company in the amount of Seven Thousand Eight Hundred Seventy-Four

Dollars and Seven Cents ($7,874.07) on July 25, 1933, whereas in truth and in fact said indebtedness and liability on said date was a different and much larger amount."

Count four made a like charge relative to the account of the National Life and Accident Insurance Company.

He was tried, found guilty, and sentenced under both counts. The point for our decision is whether the trial court erred in refusing to direct a verdict of not guilty. The essential facts are not in dispute.

From the evidence it appears—

Giles, once bookkeeper for the Commercial National Bank, became first paying and receiving teller with custody each day of some $35,000.00 cash. His duty was to receive deposits and place accompanying slips or tickets where they would reach the bookkeepers for entry. Eighteen months prior to the alleged offense, he discovered shortage in his cash but made no report to his superiors. To cover up the shortage he resorted to the practice of withholding selected deposit slips for three or four days before permitting them to reach the bookkeeping department. This caused the ledger to show false balances. Other shortages occurred; July 25, 1933, the total stood at $2,650.00.

On that day he accepted deposits with proper tickets from San Antonio Public Service Company and National Life and Accident Insurance Company for $1,985.79 and $663.27 respectively, accompanied by cash and checks. Together these approximated his shortage. He withheld both tickets from the place where they should have gone and secreted them. If placed as usual and as his duty required, they would have reached the bookkeeper during the day. Entries on the ledger would have shown the depositors' true balances.

The Bank closed July 29th. The slips never reached the bookkeeper. The individual ledger accounts at the

end of the 25th and thereafter understated the liability of the Bank to the depositors.

The respondent acknowledged his purpose in withholding the deposit tickets was to prevent officers and examiners from discovering his shortage. Some excerpts from his testimony are in the margin.[2]

---

[2] "My actual shortage was $2,650.00 that had shown up without my having any responsibility for it. The only way it could be carried was holding out deposit tickets to offset the shortage in the cash, and on the 25th of July withholding these two deposits, the San Antonio Public Service and the National Life & Accident, and depositing the two tickets that had been held over from the 21st.

"Asked if I selected those two deposit slips that day to withhold them because they, together, made up the amount of the shortage, that was the reason I selected those two, because it covered the amount of the shortage.

"The bank got the money for both of those deposits. I did not make any false entries with reference to those items. It is true that all I did was simply put the deposit slips in the cigar box and withheld them for the time being, until I could recover the shortage. I did not make any report to any bookkeeper. As to how the bookkeeping department received its information on which they keep their books, the bookkeepers came in three or four times a day and lots of days oftener, and took the deposit tickets and checks out of the drawers. The business of the day was represented by the tickets and checks. I would put those in the drawers; I had a special drawer for them, divided into sections. As to whether I took them to the bookkeepers or they came to the drawers whenever they wanted to and get them—they came and got them whether I was there or not. I had no control or direction whatever over the bookkeeping department or any bookkeeper. Mr. Crowther had control and direction over the bookkeepers; really, Mr. Roberts handled them, but Mr. Crowther was over the bookkeepers. If the entries were made on any given date showing the balance of any depositors, etc., I did not have anything whatever to do with making the entries or causing them to be made. They simply came to the drawers and got the checks and deposit slips, and from that made up their entries. These two deposit slips that were withheld and stuck in the cigar box that day would have gone right on into the books in time if the bank had not closed. . . . They were simply withheld that way to

At the conclusion of the evidence counsel moved for a directed verdict of not guilty. This was denied. The jury found guilt under both counts; an appeal, with many assignments of error, went to the Circuit Court of Appeals.

That Court declared: "The serious question presented for decision is whether the law will support a conviction on an indictment charging that defendant caused the false entries to be made."

"Of course, in a sense, one who makes a false entry causes it to be made. If he makes an entry himself or directs another to make it, an allegation in the indictment that he caused it to be made may be treated as surplusage and harmless, but where the defendant has neither made a false entry nor directed another to do so, the same allegation is material and injurious. A charge that one has caused a false entry to be made is very much broader than the charge that he made it." "We consider the allegation of the indictment that defendant

---

make my cash balance; that was the only way I had of doing that. . . . I withheld deposit tickets from time to time in order that my cash shortage would not be discovered.

"With regard to the two deposits that are directly in question in this case, one to the National Life & Accident Company and one to the San Antonio Public Service Company, each on the 25th of July, 1933, I withheld those two deposit tickets from the bookkeepers. Asked if instead of putting them in the drawer with the balance of the deposit tickets for that day, I put them in a different place where I knew the bookkeepers would not look for them, yes, sir, I put them in the cigar box. The bookkeepers had nothing to do with the cigar box. The bookkeepers would go to the regular place where the deposit slips were kept to get them. The reason I put the two deposit tickets in the cigar box was for the sole and only purpose of keeping them from the bookkeepers to keep them from going through, to keep them from going on the account of the depositors.

"Asked if by putting deposit slips in a place where he would not get them and I knew he would not get them, I had that much control

did 'cause to be made a certain false entry in a book of the bank,' charged a degree and classification of the offense not within the letter or intent of the law." "The evidence in the record conclusively shows that defendant neither made the false entries nor did anything that could be considered as a direction to the bookkeeper to make them. Without the charge that he caused the entries to be made he could not have been convicted. It follows that it was prejudicial error to overrule the motion for a directed verdict of acquittal."

Dissenting, one judge said:

"This statute plainly intends to punish the falsification of bank records with intent to deceive or defraud. If false entries are deliberately produced, although through an ignorantly [sic] innocent agent, the bank em-

---

over the bookkeepers, yes, sir, by holding them out, of course, he would not get them.

"Q. Now I show you one of the Government's Exhibits, which is the individual ledger account of the San Antonio Public Service Company in the right hand column, the 5th line from the top of the page, an entry under date of July 25th, 1933, under the column head 'new balance' which is the last balance of that account shown for July 25th, 1933, of $7,874.07; was that the true balance of that account on that date? A. That was the true balance of everything that went through to the account. Q. That is right, but was that a true balance on the account; do the figures, 7,874.07, represent the liability of the Commercial National Bank to the San Antonio Public Service Company at the close of business on July 25th, 1933? A. No, sir; the deposit slip was in my cage of $1,985.79.

"Q. And then this entry of $7,874.07 is not correct, because you did not let the bookkeepers have the deposit ticket? A. We often held deposit tickets over. Q. But you withheld it for a purpose, didn't you? A. Yes, sir. Q. Your intention in withholding it was so that it would not go on the ledger sheet, wasn't it? A. Yes, sir; I put it in the cigar box.

"I did not make any entries or figures of any sort from which the bookkeepers might have got it off the entries. The only entry I ever made was in the depositor's pass book. I therefore made no other entries."

ployee who concocts the plan and achieves the result is, in my opinion, guilty. This innocent bookkeeper was the teller's real though unconscious agent in making the entries; as truly so as if the false entries had been requested in words." ". . . the present case is not one of a mere failure to prevent a consequence, but is one of contriving that consequence and so fathering it as to make it wholly the contriver's own. The bookkeeper in making these false entries was doing the will of the teller, though he did not know it. The false entries are in law the acts of the teller who planned them and did all he needed to do to produce them."

Counsel for the respondent now affirm: "There is no dispute as to the facts." "The act committed by the defendant was the withholding by him and the failure by him to turn over to the Bookkeeping Department in the usual course of the bank's business a deposit slip." He did not *cause* any false entry to be made. Personally he made no such entry; he did not affirmatively direct one. By withholding the ticket he prevented an entry; he caused none.

The rule, often announced, that criminal statutes must be strictly construed does not require that the words of an enactment be given their narrowest meaning or that the lawmaker's evident intent be disregarded. *United States* v. *Corbett*, 215 U. S. 233, 242. Here the purpose to insure the correctness of bank records by prescribing punishment for any employee who, with intent to deceive, etc., deliberately brings about their falsification is plain enough. The statute denounces as criminal one who with intent, etc., "makes any false entry." The word "make" has many meanings, among them "To cause to exist, appear or occur," Webster's International Dictionary, 2nd ed. To hold the statute broad enough to include deliberate action from which a false entry by

an innocent intermediary necessarily follows, gives to the words employed their fair meaning and is in accord with the evident intent of Congress. To hold that it applies only when the accused personally writes the false entry or affirmatively directs another so to do would emasculate the statute—defeat the very end in view.

*Morse* v. *United States,* 174 Fed. 539, 547, 553—Circuit Court of Appeals, Second Circuit—gave much consideration to an indictment and conviction under R. S., § 5209. The Court said: "It is true that the defendant did not make any of the entries in the books or reports with his own pen. All of them were made by the employees of the bank as part of their routine work. If it were necessary to prove against a director that he actually made the entry charged to be false, conviction under the statute would be impossible, as these entries are invariably made by subordinates in the executive department. Congress was not seeking to punish the ignorant bookkeeper who copies items into the books as part of his daily task, but the officers who conceived and carried out the fraudulent scheme which the false entry was designed to conceal. It is wholly immaterial whether such officer acts through a pen or a clerk controlled by him." "It seems to us that defendant is as fully responsible for any false entries which necessarily result from the presentation of these pieces of paper which he caused to be prepared as he would if he had given oral instructions in reference to them or had written them himself."

We agree with the view so expressed in that opinion. *United States* v. *McClarty,* 191 Fed. 518 and 523, apparently is in conflict with our conclusion.

The record leaves us in no doubt that the false entries on the ledger were the intended and necessary result of respondent's deliberate action in withholding the deposit tickets. Within the statute he made them.

The judgment of the Circuit Court of Appeals must be reversed. The District Court will be affirmed.

*Reversed.*