**John Wayne MEREDITH, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 7232.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 2, 1956.

Decided Nov. 7, 1956.

---

Herschel Rose, Fairmont, W. Va., and Carl G. Bachmann, Wheeling, W. Va. (Gilbert S. Bachmann, Wheeling, W. Va., on the brief), for appellant.

Isaiah Matlack, Sp. Asst. to the Atty. Gen. (Warren Olney, III, Asst. Atty. Gen., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and SOBELOFF, Circuit Judges.

SOBELOFF, Circuit Judge.

The cashier of a national bank is here appealing from a conviction on two counts of an indictment charging him with having made or caused to be made certain false entries in the bank's general ledger Cash Account in violation of Title 18, section 1005 of the United States Code. The appeal is based on several grounds, separate but related. Chiefly these pertain to (a) the sufficiency of the evidence to show that the allegedly false entries were, in fact, false, and to (b) the Court's charge to the jury on the law relating to false entries. These and other challenges to the judgment below must now be considered, and for the adequate treatment of the issues raised an understanding of the facts is necessary.

The appellant, John Wayne Meredith, as cashier of the First National Bank of Fairmont, West Virginia, exercised full authority and direction over its affairs. The bank's president took no active part in the management of the institution, and for a long time the directors failed to direct. Their participation was limited to acting upon such matters as the cashier chose to bring to their attention.

In 1949, the appellant, with the directors' approval, entered into an arrangement with one of the bank's customers, Hammond Brick Company, to extend it credit on its notes to be secured by assignment of accounts receivable as collateral. When checks issued by the Brick Company exceeded its credit balance, the appellant habitually permitted the checks to be paid.

The company left blank notes at the bank, and these were, from time to time, filled in by the appellant to cover the overdrafts. As the company, in the course of its business, created new accounts receivable, they were assigned to the bank and credited to the Brick Company's account, but the bank continued to honor checks even when there were insufficient funds or receivables to cover previously honored checks. Before long the appellant discontinued including the indebtedness of Hammond Brick Company on the weekly list of loans. Individual directors testified that they did not recall any loans having been approved after the original authorization to extend credit on good accounts receivable.

In the course of time the overdrafts grew until they aggregated $214,916.88 on September 3, 1953, the day of the false entry mentioned in the first count; and $380,102.27 on March 2, 1954, the day mentioned in the second count.

To understand the purpose, nature and effect of the alleged false entries, it is necessary first to examine the bookkeeping procedure normally employed by the bank in paying checks drawn by its depositors. In the bank's General Ledger was a liability account denoted "Individual Deposits." This was a "control account" which showed the total amount of money on deposit with the bank. This liability account of the bank should equal the aggregate of the credits due all depositors. When the bank paid checks of

its depositors the total amount of such checks on a given day would be debited to the control account known as "Individual Deposits." Under the bank's posting system, however, the amount of each honored check was not debited to the depositors' separate accounts until the next day. Therefore, if there were insufficient funds to cover a particular check, this might not be known until the day after the entry was made in the control account.

Since the Hammond Brick Company had no credit balances the amount of its mounting overdrafts could not be charged to it the next day, as was done with other checks. It follows that the amounts so paid out and not charged to any deposit account came from the bank's own funds, since there was no other possible source for these payments. The entries which had been made in "Individual Deposits" (the control account) showed a greater reduction in the total deposit line than had actually occurred, for the Hammond account was not debited. Therefore, as the appellant's brief acknowledges, to the extent of the overdrafts the entry in the "control account" temporarily understated the bank's liability to its depositors.

In normal practice, after all honored checks were posted to the individual accounts on the following day, the amount of the overdrafts which had previously been debited was then credited back to the control account, and the "no-good" checks were returned to the payees or to the correspondent banks.

Hammond's overdrafts, however, were handled very differently. They were credited back to the control account with all other overdrafts, making the control account balance with the subsidiary ledger accounts of the individual depositors. But Hammond checks were not returned to the payee, or the correspondent banks. They were handed to the bookkeeper-teller to be included in his cash, to offset the diminution of cash which had occurred the preceding day. They were treated as "cash items" on the teller's sheet, as is customary when a check is in process of clearing; but they were not included in the Cash Account of the General Ledger. Unlike others, Hammond checks were not expected to be cleared or returned, and so, later in the day they were removed from the teller's cage and included with the incoming checks for that day as if they were new checks. The whole cycle was then begun anew by placing them again with the day's newly honored checks and including them in the debits to the control account. Thus Hammond checks continued indefinitely to float through the bank.

By the times specified in the first and second counts of the indictment, some 4000 Hammond checks had accumulated and the Company's overdrafts had snowballed to the huge figures above mentioned. Some of the checks had been making their daily rounds in the bank, being repeatedly counted in and counted out, for as long as eighteen months.

On September 3, 1953 and again on March 2, 1954, the national bank examiners visited the Bank for the customary examinations. On each occasion, after the examiners had counted the cash, the assistant cashier, Van Zandt, asked the appellant what to do about the Hammond checks. As the books then stood, according to the testimony, if the examiners would have compared the separate depositors' accounts with the general ledger the total of the separate deposits would have been found to exceed the amount stated in the "Individual Deposits" account. This would have led to the disclosure of the shortage in the cash.

In fear of such disclosure and to meet this crisis, the appellant, on the occasion of each of the two visits of the examiners mentioned above, instructed Van Zandt after the examiners had counted the cash but while the examination was still in progress, to have two entries made in the General Ledger. First, he ordered the amount of the Hammond checks to be credited to the liability account called "Individual Deposits." By so doing that account was made to equal the actual total of all of the separate depositors' accounts, so that if the examiners should

run each account no discrepancy would appear. Second, Meredith instructed Van Zandt to debit the total of the Hammond overdrafts to the asset account "Cash." Van Zandt in turn directed the bookkeeper, Burke White, to make the entries, and this he did. To the existing total figure appearing on the Cash Account, namely $483,128.08 on September 3, 1953, $214,916.88 was added and the total was changed to $698,044.93, and similarly on March 2, 1954 to the total of $434,842.03, an addition of $380,102.27 was made to change it to $814,944.30. This resulted in the concealment of the shortage in cash due to the Hammond overdrafts. A further result was concealment of the fact that the bank had in effect loaned more money to one customer than could legally be loaned it. The above entries in the Cash Account are the false entries charged in respect of the two dates named in the indictment.

The testimony further shows that this variation in the treatment of the Hammond checks as cash items did not long persist. When the challenged entries, made while the examiners were present, had served their fraudulent and deceptive purpose, reversing entries were made on the bank's books. The amounts previously credited to the control account known as "Individual Deposits" were now debited, and the amounts previously debited to the Cash Account were now credited. This restored the situation as it was before the bank examiners arrived, and the overdraft checks' daily cycle through the bank was then resumed until the next examination.

The witness Figg testified that the entries on the Cash Account were false in that they overstated the cash. The appellant contends, despite the practice that prevailed at all times when no bank examiners were present, that the bank and its employees regarded the checks as cash items which were therefore properly added to the Cash Account. Employees of the bank however, including the one who actually made the entries, supported the testimony of the Bank Examiner as to the falsity of the entries.

## I.

Title 18, section 1005, United States Code, under which the appellant was indicted, provides that:

"Whoever makes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System— Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

In seeking reversal of his conviction, the appellant first contends that the evidence is not sufficient to establish a false entry within the statutory meaning. Here the appellant relies upon the principle that there is no false entry where it is made exactly as the transaction occurred. His analogy is based upon the premise that the Hammond checks were indeed cash assets of the bank and that the entries in "Cash" corresponded to the actual transactions. But the cases which appellant cites as controlling are, as we shall see, inapplicable here. We turn to them.

Coffin v. United States, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481, is authority for the proposition that where an officer had misapplied bank funds by honoring the checks of an insolvent, the entry of such a wrongful transaction on the bank's books as *an extension of credit* was not a false entry, because it showed what had actually taken place. And in Cooper v. United States, 4 Cir., 13 F.2d 16, 19, it was decided that where the defendant discounted a note of a financially irresponsible maker and endorser, it was not a false entry either to credit the funds to their account or to enter the note on the books as a *debt due* the bank. So, too, in Dow v. United States, 8 Cir., 82 F. 904, 910,

it was said that "* * * if an overdraft is in fact made and allowed, under circumstances which make the transaction a fraud upon the bank, the entry of the transaction just as it occurred is not a false entry. * * *" But this must be read in the light of the Court's holding that the District Judge had in effect charged the jury that mere reception and crediting to a third party of an overdraft was in itself a false entry. And in Twining v. United States, 3 Cir., 141 F. 41, it was held that although the obligations to the bank of certain persons were reduced unjustifiably, the entries in the books showing those reductions were true entries because the reductions had actually been made.

In all of these cases wrongful transactions were reported on the bank's books as they actually occurred. In the case before us, by contrast, there were not merely payments of bad checks and corresponding entries of *extensions of credit* or of *debts due*. Here transactions which did not occur were included in the entries, and dead items were entered on the bank's books as assets. As the government pointed out, the theory of the appellant as to the Hammond overdrafts is "once a cash item, always a cash item," even long after it is known beyond question that there are not sufficient funds to cover the same. Day after day entries were noted in the control account purporting to reflect transactions that were not made, and these fictitious entries were in turn used as a basis for the entries on September 1953 and March 1954.

This is not an attempt to punish as an offense the truthful recording in due course of business transactions that are fraudulent. In such a case, while the fraud might be punishable, the truthful entry would not be. The accusation in the indictment, as we see it, is not that the defendant merely misnamed an item. Nor is the charge that an asset was worth less than purported by the entry. Neither is the appellant charged with being tardy in the recognition of a loss. The essence of the offense laid in the indictment and supported by proof is of a more substantial character. It is that checks which to the certain knowledge of the defendant were in fact not cash items, and were never treated as such on the General Ledger Cash Account except temporarily when the examiners were in the bank, were falsely entered as "cash items" to deceive the bank examiners.

■ What is a false entry is essentially a question of fact to be found by the jury if there is a proper basis in the evidence for such finding. All relevant circumstances are to be considered by the jury in determining whether or not a check is in fact a cash item. Common banking practice and the practice followed in the particular bank may be relevant. It cannot be denied that when checks drawn against insufficient funds remain in a bank's possession overnight or for a short time pending clearance or collection, they are ordinarily treated as cash items. It does not follow that such treatment may be continued indefinitely. Certainly it does not follow that the bad check may be run through the bank's books again and again and treated as if it were a new and genuine transaction. Here between bank examinations, the checks were not treated by the bank as cash items and were not included in the cash account in the general ledger, but were daily shuffled back and forth between the bookkeeper-teller's cash sheet and the control account "Individual Deposits."

■ Not what a thing is called but what it is determines its character, and this is ordinarily a jury question. This Record affords ample basis for a jury to conclude that numerous checks which had long been found uncollectible were permitted every day for months to course their way in and out of the bank's ledgers to hide the truth that the bank had parted with money and had received no equivalent asset. The jury could reasonably find that this was not the recording of real transactions but merely an attempt to give a simulated vitality and validity to checks known to be without life. They could reasonably further find that the entries alleged in Counts 1 and 2 were

recapitulations of false entries and were, therefore, themselves false. They could consider the circumstances under which these latter entries were made, in the very hour when the examiners were in the bank, and how later they were cancelled out when the examiners departed. They could infer that this manoeuvre, twice performed during examinations was designed to deceive, as it did deceive, the examiners. The appellant himself, in a colorful figure of speech, testified that the only way the examiners could "catch the rabbit running between the accounts was to examine both accounts at the same time." In short, there was sufficient evidence in law and in common sense for the Court to submit the case to the jury, and the verdict is supported by the evidence.

## II.

Closely related to the subject of the above discussion is the complaint of the appellant against the following language in the charge:

"By way of illustration, it may be the truth that there were checks of the Hammond Brick Company in the First National Bank in Fairmont which had a face value of the amount entered for them on the cash record of the bank on the dates shown in the evidence. But was this the whole truth?"

The appellant insists that the Judge thereby conceded that the checks were cash items but that he made truth or falsity of the entries depend only on the worth or worthlessness of the Hammond checks. We do not so read the charge. The Court was merely directing the jury's attention to the question of the worth or worthlessness of the checks as a fact to consider in connection with other facts in determining the truth or falsity of the entries. The extent of the collectibility of the checks in question was certainly a relevant fact, and the District Judge was obviously correct in his comment. In the paragraph following the quoted language the Court made it perfectly clear that the controlling question was the truth or falsity of the entries. We do not think that the jury was misled or the appellant prejudiced.

It is complained that there was no basis in the testimony for charging the jury on the hypothesis of the worthlessness of the checks, since they did not result in a total loss, and the bank recovered about 20% of the overdrafts. The fact that a small part was ultimately retrieved is not material; and if the Hammond checks were not entirely worthless, they were certainly worthless as to a large part of their face amount.

The appellant insists that even if the checks were known to be worthless this would not make them less eligible to be included as cash items. He relies chiefly on United States v. Young, D.C.M.D.Ala., 128 F. 111, which is represented as "on all fours." That case, however, is readily distinguishable because as the Court carefully pointed out, the entry of the check as a cash item was made when it was received by the cashier and only then. This is a recognized banking procedure in dealing with overdrafts for a short period. The contrast with our case is plain, for here checks, uncollected and uncollectible, accumulated over long periods of time and were repeatedly entered upon the ledger as current items, and these fanciful transactions were the foundation for the false entries charged.

## III.

After citing the statute condemning the making of a false entry in any book of a bank in order to deceive an examiner, the Judge's charge called attention to the substance of Title 18, section 2, U.S. Code, which provides as follows:

2(a) "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal."

2(b) "Whoever causes an act to be done, which if directly performed by him would be an offense against the United States, is also a principal and punishable as such."

The appellant maintains that the inclusion of this matter in the charge was erroneous, because neither of the sub-sections applies to him. His is a double contention: First, he says that he cannot be convicted as an aider and abettor under sub-section 2(a) in the absence of proof that some other person was guilty as principal in the commission of a crime. He asserts that in the instant case the government undertook to prove that the appellant was the only offender and hence he argues that he cannot legally be regarded as an aider or abettor. But elsewhere in the brief the appellant points out that both Van Zandt and White, an assistant cashier and bookkeeper, respectively, were not mere clerks or ignorant persons, but responsible officers of long experience in the bank. Indeed he expressly says: "In the instant case the intermediaries who made the entries were not 'innocent' intermediaries, but were men of full and mature experience, not only in banking but in bank bookkeeping. They knew everything that the defendant knew about the origin of the checks, their character and the manner in which they were being handled in the bank."

■■ If the jury accepted this version, they could conclude, for the purpose of this case, that a crime was committed by either Van Zandt or White, or both of them. If so, there is ample evidence to justify a finding that in directing the entries to be made the appellant made himself their aider and abettor as defined in sub-section 2(a) and hence guilty as a principal. Under this provision, conviction of the principal actor is not a prerequisite to conviction of the aider and abettor. It need only be established that the act constituting the offense was in fact committed by someone. Von Patzoll v. United States, 10 Cir., 163 F.2d

216; Colosacco v. United States, 10 Cir., 196 F.2d 165.

■ On the other hand, notwithstanding his first contention in respect to sub-section 2(a), the appellant also contends that he cannot be convicted under sub-section 2(b) for "causing" the entries to be made. This argument runs as follows: That since his subordinates were not innocent agents, he could not be deemed to have "caused" them to make the entries within the meaning of sub-section 2(b). He reasons that under United States v. Giles, 300 U.S. 41, 57 S.Ct. 340, 81 L.Ed. 493, one who uses an innocent intermediary to make a false entry may be regarded as violating Title 18, section 1005, the offense charged in this indictment. This was indeed the holding of the Court in the Giles case, but it does not follow, if the intermediary is not innocent, that the person who "causes" the act to be done may not be held accountable under subsection 2(b) of Title 18 U.S.Code. A reading of the opinion makes it clear that in extending the word "cause" to include the commission of an act by an innocent intermediary, the Court in the Giles case premised that the statute applied where the intermediary was not innocent. United States v. Giles, supra, 300 U.S. at pages 48–49, 57 S.Ct. at page 344.[1]

Whether or not, as queried in United States v. Chiarella, 2 Cir., 184 F.2d 903, sub-section 2(b) enlarges the common law would not affect the result here. In that case, where the indictment was for counterfeiting, the defendant Stancin's only part in the transactions was to call one of the defendants by long-distance telephone, greet him, and then hand the phone to a codefendant. He apparently took no further part in the subsequent dealings. Judge Hand held this to be too remote a causation to fall within sub-sec-

1. Cases recognizing that the defendant "caused" the crime where the act was done by a "knowing" intermediary are Todorow v. United States, 9 Cir., 173 F. 2d 439; Turner v. United States, 9 Cir., 202 F.2d 523; Pereira v. United States, 5 Cir., 202 F.2d 830, affirmed 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435; United States v. Caplan, D.C.W.D.Pa., 123 F. Supp. 862, reversed on other grounds United States v. Tornabene, 3 Cir., 222 F.2d 875.

tion 2(b). In the case before us, however, the appellant *directly* caused the entry by his instructions to Van Zandt, or at least the jury could so find without indulging in subtle philosophical speculation as to causation.

Under the testimony of this case the jury could have concluded that the officers who acted by direction of the appellant were principals in the commission of a crime and that the appellant aided and abetted them within sub-section 2(a); and whether the jury concluded that these officers were guilty or not guilty as principals, a verdict against the appellant could properly be based on sub-section 2(b), for "causing" the false entry. There was no error in submitting these alternatives to the jury.

### IV.

██ A further contention advanced by the appellant is that the trial court erred in admitting the testimony of certain government witnesses who gave their opinion that the disputed entries were false. It is argued that to allow expert opinion upon the ultimate issue is to permit the witnesses to usurp the jury's function. We think this broad and oft-stated proposition should not be applied as a dogmatic rule, for the modern tendency in the law of evidence is to give the triers of facts all the light they can have, especially in complicated, technical situations. It is now well established that " * * * the jury should have help if it is needed." Wigmore, 3rd Edition, section 1921. Chief Judge Parker said for this court in Frankfeld v. United States, 4 Cir., 198 F.2d 679, 689: "In so far as it involved matter of opinion, this related to a matter involving specialized knowledge, as to which the opinion of experts is unquestionably admissible, even though it relates to a matter which is for the decision of the jury." See also Transportation Line v. Hope, 95 U.S. 297, 24 L.Ed. 477; and Builders Steel Co. v. C. I. R., 8 Cir., 179 F.2d 377, 380.

### V.

Finally, the appellant claims that there was error in not requiring the Government to elect on which counts to proceed. In addition to Counts 1 and 2, with which we have been concerned on this appeal, there were four other counts. Counts 3 and 4 charged wilful misapplication of funds in cashing certain checks of Manchins, another customer of the bank. By timely motion under Rule 14, Federal Rules of Criminal Procedure, 18 U.S.C., the appellant claimed that it was a misjoinder to include these counts with counts 1 and 2 and sought a severance of counts, which was denied. He was acquitted on counts 3 and 4, as well as on counts 5 and 6 which charged similar misapplication in paying Hammond checks. But on this appeal appellant insists that it was error to permit the Government to proceed to trial on all the counts, and that the conviction on counts 1 and 2 may have been influenced by testimony admitted in support of counts 3 and 4.

██ Rule 8(a) of the Rules of Criminal Procedure permits the joinder of offenses of the same or similar character. The indictment here fulfills this requirement. Rule 14 authorizes the Court upon motion of the defendant to order an election or separate trials of counts if it appears that the joinder is prejudicial. It has always been held to be within the trial court's sound discretion to grant or refuse such a motion, and such discretion will not be disturbed on appeal unless it is affirmatively shown to have been abused. Except for the appellant's mere assertion of prejudice, there is nothing in the Record before us to suggest that he has been in any way prejudiced. No abuse of discretion by the trial judge has been shown.

Finding no error in the trial below, the judgment will be affirmed.

Affirmed.