**UNITED STATES of America,**
**Libelant,**

**v.**

**ONE 6.5 mm. MANNLICHER–CARCANO MILITARY RIFLE, Model 91–38, Serial No. C2766, with Appurtenances, and One .38 Special S&W Victory Model Revolver, Serial No. V510210, with Appurtenances, Respondents.**

**Civ. A. No. 3–1171.**

United States District Court
N. D. Texas,
Dallas Division.

Feb. 23, 1966.

B. H. Timmins, Jr., Asst. U. S. Atty., James F. Gaulding, Asst. Regional Counsel, Alcohol and Tobacco Tax Div., Dallas, Tex., for libelant.

William C. Garrett and Eugene R. Lyerly, Kilgore & Kilgore, Dallas, Tex., for John J. King; Holmberg & Poulson, James S. Holmberg, Denver, Colo., of counsel.

ESTES, Chief Judge.

The United States of America brings this proceeding for forfeiture of respondent military rifle and revolver to the government because these weapons were involved in violations of the Federal Firearms Act, 15 U.S.C. §§ 901–909. Claimant, John J. King, denies the right of the government to forfeiture and claims title to the weapons by purchase from Marina N. Oswald, individually and as community administratrix of the estate of Lee Harvey Oswald. It is stipulated for the purpose of this action only that respondent rifle was used by Lee Harvey Oswald in

**412**

the assassination of President Kennedy and the pistol was used by Lee Harvey Oswald in killing a Dallas police officer. The case was heard on the "Stipulation of Facts" appended hereto, briefs and oral argument.

Title 15, United States Code, § 903(d), enacted June 30, 1938, provides:

"Licensed dealers shall maintain such permanent records of * * * shipment, and * * * disposal of firearms * * * as the Secretary of the Treasury shall prescribe." (* * ch. 850, § 3, 52 Stat. 1251.)

Section 905(a) provides:

"Any person violating any of the provisions of this chapter or any rules and regulations promulgated hereunder * * * shall, upon conviction thereof, be * * * [guilty of a felony offense]."

Section 905(b), enacted February 7, 1950, provides:

"Any firearm * * * involved in any violation of the provisions of this chapter or any rules or regulations promulgated thereunder shall be subject to seizure and forfeiture * * *." (June 30, 1938, ch. 850, § 5, 52 Stat. 1252; Feb. 7, 1950, ch. 2, 64 Stat. 3.)

Section 907 authorizes the Secretary of the Treasury to prescribe such rules and regulations as he deems necessary to carry out the provisions of the Federal Firearms Act.

■ 26 Code of Federal Regulations, § 177.51 Firearms Records, provides:

"Each licensed * * * dealer shall maintain complete and adequate records. * * * The records will show and include: * * * (c) The disposition made of each firearm including the name and address of the person to whom sold. * * *"

This means, of course, the name by which the purchaser could be identified, not a fictitious name which would not disclose but would conceal his identity.

■■ The names A. Hidell and A. J. Hidell were purely fictitious names will-

fully, intentionally, deliberately and fraudulently contrived by Lee Harvey Oswald for the purpose of deceiving the dealers and concealing Oswald's identity as purchaser of respondent rifle and revolver.

" * * * Regulations issued by the Secretary of the Treasury, pursuant to statutory authority, and when [as here] necessary to make a statute effective * * * [have] the force of law." United States v. Fisher (5 Cir. 1965), 353 F.2d 396, 398–99, citing Fawcus Machine Co. v. United States, 282 U.S. 375, 51 S.Ct. 144, 75 L.Ed. 397; Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831.

In the history of the Federal Firearms Act [enacted June 30, 1938, 15 U.S.C. §§ 901–909, which did not include § 905(b), enacted February 7, 1950], Senate Report No. 82, 75th Congress, states:

"The bill under consideration * * * is designed to regulate * * * the shipment through interstate commerce of all firearms [and] * * * will go far in the direction we are seeking and will eliminate the gun from the crooks' hands."

In the history of 15 U.S.C. § 905(b), which provides for seizure and forfeiture for any violation of the Federal Firearms Act "or any rules or regulations * * * thereunder," Senate Report No. 1207 (January 6, 1950), U.S.Code Cong. Service 1950, p. 1907, shows that the purpose of this legislation is to give express authority to law enforcement officials "for the seizure, forfeiture, and disposition of firearms * * * involved in violations of the Federal Firearms Act. (U.S.C., title 15, secs. 901–909)."

■ To constitute a crime, there must be the joint operation of two essential elements, an act forbidden by law and an intent to do the act, or there must be the omission of a duty required by the law and the intent to omit that duty.

■ In determining a defendant's intention, the law assumes that every per-

son intends the natural consequences of his voluntary acts or omissions. Therefore, the intent required to be proven as an element of the crime is inferred from the defendant's voluntary commission of the act forbidden by law, or from his omission of the duty required by law, and it is not necessary to establish that the defendant knew that his act or omission was a violation of the law.

Section 2 of Title 18, U.S.C., provides:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

An actor who commits an offense can be the "real though unconscious agent" whose conviction is not a prerequisite to conviction of the one who causes the offense to be committed. United States v. Giles (1937), 300 U.S. 41, 48, 57 S.Ct. 340, 81 L.Ed. 493; Walker v. United States (10 Cir., 1951), 192 F.2d 47.

Lee Harvey Oswald violated and caused to be violated the Federal Firearms Act, 15 U.S.C. § 903(d), and the regulations promulgated thereunder, 26 C.F.R. 177.-51, requiring "[e]ach licensed * * * dealer * * * [to] maintain complete and adequate records * * * [which] show * * * [t]he disposition made of each firearm including the name * * * of the person to whom sold * * * *", in that Lee Harvey Oswald voluntarily, willfully, intentionally, fraudulently and deliberately caused the fictitious names A. Hidell and A. J. Hidell to be entered in the firearms dealers' records as purchaser of the respondent rifle and revolver, respectively, by placing those fictitious names in his order for respondent firearms, thereby causing the records to fail to show the name of the person to whom respondent firearms were actually sold.

All the circumstances and the fact that Lee Harvey Oswald did not use his own name in his purchase orders, but instead used the fictitious names A. Hidell and A. J. Hidell, plainly show that Oswald intended to mislead and deceive the dealers and to make it appear that a person separate and apart from Oswald was the person to whom the firearms were sold, thereby deliberately, willfully, intentionally and fraudulently producing a record which failed to show the name of the person to whom the firearms were sold.

In United States v. Giles (1937), 300 U.S. 41, 57 S.Ct. 340, the Supreme Court held that to commit the offense of making a false entry in bank records, a person need not himself make the false entry if, in fact, he takes

" * * * deliberate action from which a false entry by an innocent intermediary necessarily follows * * *. To hold that it [the false entry statute] applies only when the accused personally writes the false entry or affirmatively directs another so to do would emasculate the statute—defeat the very end in view.

* * *

" * * * [T]he false entries * * * were the intended and necessary result of respondent's deliberate action * * *. Within the statute he made them." At 48–49, 57 S.Ct. at 344.

Likewise, the failure of the firearms dealers' records to show the name of the person to whom the respondent rifle and revolver were sold was the intended and necessary result of Oswald's deliberate actions.

 The records of the sale of these weapons specifically referred to and "involved" respondent rifle and revolver. Lee Harvey Oswald willfully caused the firearms dealers to fail to keep "complete and adequate" records of the disposition of the respondent firearms as required by law, by deliberately, willfully, intentionally and fraudulently producing records which did not show the name of the firearms purchaser as required by

law. Respondent firearms were "involved in" a violation of the record-keeping provisions of 15 U.S.C. § 903(d) and 26 C.F.R. § 177.51, and have been forfeited to the United States under Section 905(b) of Title 15 U.S.C.

Violations of record-keeping laws and regulations thereunder have been held to exist where sellers required to keep records of sales were caused by purchasers to make false records of the address to be entered on records of narcotic sales, Walker v. United States (10 Cir., 1951), 192 F.2d 47; and entries on bank records, United States v. Giles (1937), 300 U.S. 41, 57 S.Ct. 340. Liquor, Thacher's Distilled Spirits v. United States (1881), 103 U.S. 679, 26 L.Ed. 535; and automobiles, One 1941 Buick Sedan, etc. v. United States (10 Cir., 1946), 158 F.2d 445, have been held subject to forfeiture for failure to keep required records of liquor sales.

The requirement of the law, 15 U.S.C. § 903(d), and the regulations, 26 C.F.R. § 177.51, that the dealer keep a record showing the name of the person to whom a firearm is sold was enacted for the important purpose of identifying the person to whom firearms are sold and to "eliminate the gun from the crooks' hands." If the deliberate production of records with fictitious names of purchasers of firearms does not violate the Federal Firearms Act, then every crook in the United States can, by the simple device of ordering in a fictitious name, obtain firearms with complete immunity. This would make a shambles of the Federal Firearms Act.

Claimant King's contentions that forfeiture of respondent firearms deprives him of property without due process of law and takes private property for public use without just compensation is without merit. In Associates Investment Co. v. United States (5 Cir., 1955), 220 F.2d 885, the Court said in respect to forfeiture of an automobile used in the transportation of marihuana:

"* * * [I]t is well settled that such deprivation [forfeiture] is not a denial of due process of law, or a taking of private property for public use without fair compensation." At 888.

Judge Will's discriminating opinion in United States v. One 1962 Ford Thunderbird (N.D.Ill., 1964), 232 F.Supp. 1019, 1022, states:

"Where Congress, in the implementation of its constitutional powers, provides for penalties such as forfeitures, such action is not a taking of property in a constitutional sense. It is not an instance of eminent domain, in which property is taken because the *use of such property* is beneficial to the public. Rather, the property interest is infringed because Congress has deemed it necessary in order to preserve other incidents of the public welfare. As such, it represents a federal exercise of a police power to which the constitutional requirement of compensation is inapplicable. See Hamilton v. Kentucky Distillers Co., 251 U.S. 146, 156–157, 40 S.Ct. 106, 64 L.Ed. 194 (1919) * * *." *

Claimant King is in no sense an innocent purchaser. He knew when he purchased his claimed interest in these firearms, on December 31, 1964, and March 25, 1965, that they were not in the possession of the seller, Marina N. Oswald, individually and as community administratrix of the Estate of Lee Harvey Oswald, and that the weapons were in possession of agents of the United States. The Bill of Sale and Contract covering "all right, title and interest" of the seller in the weapons expressly recognizes that the weapons were subject to "adverse claims." A $35,000 additional contingent payment was conditioned upon obtaining possession "free and clear of all adverse claims."

---

* See also One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965).

 Forfeiture of respondent weapons occurred and took effect immediately upon their involvement in the violation of the Federal Firearms Act in March, 1963, and the right to the property vested in the United States at that time. Formal declaration of forfeiture relates back to that time and avoids all intervening sales, even to innocent purchasers. United States v. Stowell (1890), 133 U.S. 1, 17, 10 S.Ct. 244, 33 L.Ed. 555; Thacher's Distilled Spirits v. United States (1881), 103 U.S. 679, 26 L.Ed. 535. The government is entitled to judgment of forfeiture.

 See Public Law 89–318, 79 Stat. 1185 (originally introduced as H.R. 9545), dealing with the acquisition and preservation of certain items of evidence before the President's Commission on the Assassination of President John F. Kennedy, by the exercise of eminent domain, is not in irreconcilable conflict with, and was not intended as a repeal of or substitute for, the provisions of the Federal Firearms Act. The cardinal rule is that repeals by implication are not favored. Posadas v. National City Bank (1936), 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351. Nothing in the Act or its history either mentions or refers to the Federal Firearms Act. There is no basis in the record for inferring that Congress had any intent to repeal or affect in any way the forfeiture provisions of the Federal Firearms Act.

Obviously, neither the Attorney General nor the Congress had the authority to decide the question before this Court of the forfeitability of these weapons to the government. All concerned were determined that these weapons and other items of evidence designated by the Attorney General would be preserved by the government of the United States. To make sure this was done, Public Law 89–318 was passed. If either the Attorney General or the Congress had any idea that they were repealing, altering or affecting the forfeiture provisions of the Federal Firearms Act, they made no mention of it. It must be concluded that they had no such intention.

Counsel will submit a judgment of forfeiture.

## STIPULATION OF FACTS

It is stipulated and agreed for the purpose of the above-shown action and for no other purpose, even though the parties thereto may be identical, that the hereinafter outlined facts may be taken as true. Neither party agrees that any particular fact hereinafter stipulated is relevant or material to the issue.

1. The rifle and revolver described in the Libel of Information are herein respectively called the "Rifle" and the "Pistol."

2. That on November 22, 1963, Eugene Boone, Deputy Sheriff, Dallas County, Texas, and Seymour Weitzman, Deputy Constable, Dallas County, Texas, discovered the rifle with telescopic sight on the sixth floor of the Texas Book Depository Building, Dallas, Texas. (President's Commission Report, page 79.)

3. That on November 22, 1963, Lt. J. C. Day, Dallas Police Department, removed the rifle and telescopic sight from the sixth floor of the Texas Book Depository Building, Dallas, Texas, and took such rifle to the Dallas Police Department office as property taken as evidence in connection with the assassination of President John F. Kennedy. (PCR, p. 79)

4. That the right palm print of Lee Harvey Oswald was found on the underside of the barrel of the rifle by Lt. J. C. Day, Dallas Police Department. (PCR, pp. 122–123.)

5. That on November 22, 1963, in Dallas, Texas, Dallas police officers took the respondent pistol from Lee Harvey Oswald. (PCR, pp. 178–179.)

6. That the respondent rifle and respondent pistol were transferred between various places and persons as follows:

(a) November 22, 1963, the rifle was received by an F.B.I. agent from the Dallas Police Department.

(b) November 23, 1963, the rifle was taken to the F.B.I. Laboratory, Washington, D. C., by an F.B.I. Special Agent.

(c) November 24, 1963, the rifle was returned to the F.B.I. vault in Dallas, Texas, and later on that date was turned over to Dallas Police Chief Jesse E. Curry.

(d) November 26, 1963, Dallas Police Department returned the rifle to F.B.I. Special Agent for return to the F.B.I. vault.

(e) November 27, 1963, rifle was taken to F.B.I. Laboratory, Washington, D. C., by Special Agent, F.B.I.

(f) February 5, 1964, rifle delivered to President's Commission on the Assassination of President John F. Kennedy.

(g) February 6, 1964, rifle returned to F.B.I. Laboratory.

(h) February 17, 1964, rifle delivered to President's Commission.

(i) February 17, 1964, rifle returned to F.B.I. Laboratory.

(j) March 11, 1964, rifle delivered to President's Commission.

(k) March 11, 1964, rifle returned to F.B.I. Laboratory.

(l) March 17, 1964, rifle delivered to President's Commission.

(m) March 30, 1964, rifle returned to F.B.I. Laboratory.

(n) March 31, 1964, rifle delivered to President's Commission.

(o) May 8, 1964, rifle returned to F. B.I. Laboratory.

(p) July 2, 1964, rifle delivered to President's Commission.

(q) July 2, 1964, rifle returned to F. B.I. Laboratory.

(r) August 13, 1965, rifle shipped from F.B.I. Laboratory, Washington, D. C., to F.B.I. office, Dallas, Texas, arriving in Dallas, Texas, on August 16, 1965.

(s) At sometime during the period March 17, 1964 to March 30, 1964, rifle was tested by the Weapons Evaluation Branch, Department of the Army, Aberdeen Proving Ground, Maryland. Also, during or about March 1964, the rifle was tested at Edgewood Arsenal, Maryland.

(aa) November 22, 1963, in Dallas, Texas, officers of Dallas Police Department took the pistol, and on this same date turned the pistol over to a Special Agent of the F.B.I.

(bb) November 23, 1963, the pistol was taken to the F.B.I. Laboratory, Washington, D.C., by an F.B.I. agent.

(cc) November 24, 1963, the pistol was returned to the F.B.I. vault in Dallas, Texas, and later on this date was turned over to Dallas Police Chief Jesse E. Curry.

(dd) November 26, 1963, the pistol was returned to the F.B.I. Special Agent by the Dallas Police Department.

(ee) November 27, 1963, the pistol was taken to the F.B.I. Laboratory, Washington, D. C., by F.B.I. Special Agent.

(ff) February 5, 1964, the pistol was delivered to the President's Commission on the Assassination of President John F. Kennedy.

(gg) February 6, 1964, the pistol was returned to the F.B.I. Laboratory.

(hh) March 25, 1964, the pistol was delivered to the President's Commission.

(ii) March 30, 1964, the pistol was returned to the F.B.I. Laboratory.

(jj) April 1, 1964, the pistol was delivered to the President's Commission.

(kk) May 1, 1964, the pistol was returned to the F.B.I. Laboratory.

(ll) August 13, 1965, the pistol was shipped from the F.B.I. Laboratory, Washington, D.C., to F.B.I. office in Dallas, Texas, arriving in Dallas on August 16, 1965.

7. On November 29, 1963, by Executive Order No. 11130, President Lyndon B. Johnson created the Commission to

investigate the assassination on November 22, 1963, of John Fitzgerald Kennedy, the 35th President of the United States. (PCR Foreword.)

8. Attached hereto as Exhibits Nos. 1 and 2 are true and correct copies of Senate Report #851 and House Report No. 813 on H.R. 9545 providing for the acquisition and preservation of certain items of evidence pertaining to the assassination of President John F. Kennedy.

9. That the rifle was shipped to one A. Hidell, P. O. Box 2915, Dallas, Texas, on March 20, 1963, by Klein's Sporting Goods Company, Inc., 4540 West Madison Street, Chicago 24, Illinois. (PCR, pp. 118–119.)

10. That the order for the rifle was on a coupon clipped from the American Rifleman Magazine; that this order coupon was signed, in handprinting, A. Hidell, P. O. Box 2915, Dallas, Texas; and that this printing on the face of the mail order coupon was in the handprinting of Lee Harvey Oswald. (PCR, p. 119.)

11. Attached hereto as Exhibits 3, 4, 5, and 6 are true and correct photographic reproductions accurately depicting information contained on the originals of documents reflecting the order, invoice for shipment, and payment for the rifle.

12. That at sometime during the period January 27, 1963 and March 13, 1963, Seaport Traders, Inc., a division of George Rose and Company, Inc., Los Angeles, California, received an order for the pistol, which order was signed A. J. Hidell, and the address was shown as Post Office Box 2915, Dallas, Texas. (PCR, p. 174.)

13. That on March 13, 1963, an invoice was prepared by Seaport Traders, Inc., Los Angeles, California, covering the sale of the pistol to A. J. Hidell, Post Office Box 2915, Dallas, Texas, and this revolver was shipped to the name and address shown on the invoice on March 20, 1963. (PCR, pp. 174 and 173).

14. Attached hereto as Exhibits 7, 8, 9, 10, and 11 are true and correct photographic reproductions accurately depicting information contained on the originals of documents reflecting the order, invoice for shipment, and shipment for the pistol.

15. That Post Office Box 2915, Dallas, Texas, was rented in the name of Lee H. Oswald from October 9, 1962 to May 14, 1963. (PCR, p. 119.)

16. That Post Office Box 2915, Dallas, Texas, was rented by Lee Harvey Oswald from October 9, 1962 to May 14, 1963. (PCR, pp. 119–120.)

17. Attached hereto as Exhibit 12 is a true and correct photographic reproduction accurately depicting information contained on the original document reflecting renting of Post Office Box 2915, Dallas, Texas, by Lee H. Oswald.

18. That the mail order for the rifle was made by Lee Harvey Oswald using the name A. Hidell. (PCR, p. 569.)

19. That the mail order for the pistol was made by Lee Harvey Oswald using the name of A. J. Hidell. (PCR, p. 570.)

20. The individual who mailed the purchase orders, referred to in stipulations 10 and 11 above, was given the name Lee Harvey Oswald at birth. (PCR, p. 377.) In the purchase of the rifle in March 1963, Lee Harvey Oswald used the name "A. Hidell," and in the purchase of the pistol, Lee Harvey Oswald used the name "A. J. Hidell." (PCR, pp. 119–121.) The post office box to which the rifle and pistol were sent was rented in the name of Lee H. Oswald. (PCR, p. 119) At the time of his arrest on November 22, 1963, Lee Harvey Oswald carried on his person a forged Selective Service Notice of Classification in the name of "Alek James Hidell" and a forged United States Marine Corps Certificate of Service in the name of "Alek James Hidell." (PCR, pp. 571–574.) He also had on his person a Selective Service Notice of Classification, a Selective Service Registration Certificate, and a United States Marine Corps Certificate of Service, all in the name of Lee Harvey Oswald. (PCR, pp. 571–574.) Lee Harvey Oswald rented a room at 1026 N. Beckley Avenue, Dallas, Texas, in the

name of "O. H. Lee" where he lived on November 22, 1963, and his landlady at this address did not know him as Lee Harvey Oswald. (PCR, pp. 182, 419.) Among Lee Harvey Oswald's effects at 1026 N. Beckley Avenue, Dallas, Texas, there was found a vaccination certificate dated June 8, 1963, showing vaccination of Lee Harvey Oswald by "Dr. A. J. Hideel," P. O. Box 30016, New Orleans, Louisiana. The signature of Dr. A. J. Hideel was in the handwriting of Lee Harvey Oswald. There was no P. O. Box 30016 in New Orleans; however, Lee Harvey Oswald rented box 30061 in New Orleans on June 3, 1963, and "A. J. Hidell" was shown as an additional person entitled to receive mail there. (PCR, pp. 121–122.)

In May 1963, Lee Harvey Oswald, while in New Orleans, joined a New York organization called Fair Play for Cuba Committee. (PCR, p. 290) He caused to be printed handbills headed "Hands Off Cuba" and had membership cards for a local New Orleans FPCC Chapter. (PCR, p. 291.) Lee Harvey Oswald's membership card for the New Orleans Chapter of FPCC showed member name as Lee Harvey Oswald and also showed "A. J. Hidell" as chapter president. (PCR, p. 292.) Mrs. Marina Oswald helped Lee Harvey Oswald by writing the name "Hidell" on the membership cards at the insistence of Lee Harvey Oswald. (PCR, p. 292.) Some of the "Hands Off Cuba" handbills showed the name and address of "L. H. Oswald, 4907 Magazine Street, New Orleans, Louisiana"; whereas others showed "A. J. Hidell, P. O. Box 30016, New Orleans, Louisiana." (PCR, p. 409.) Lee Harvey Oswald was the only member of the FPCC Chapter which he attempted to organize in New Orleans. (PCR, p. 407.) He was arrested by New Orleans Police on August 9, 1963, for disturbing the peace because of a street fight in connection with the distribution of the "Hands Off Cuba" handbills. He was arrested as Lee Harvey Oswald. (PCR, p. 436.)

Mrs. Marina Oswald first heard of Lee Harvey Oswald's use of the name "Hidell" in connection with the pro-Castro activity in New Orleans, which was after May 29, 1963. (PCR, pp. 122, 290). The name "Alek," however, was a nickname used by Lee Harvey Oswald in Russia, and he signed "Alek" to some letters written to Marina Oswald. (PCR, p. 122.)

Lee Harvey Oswald and Marina Oswald were known by the name Oswald by the Paine family in Irving, Texas, where the family lived in October and November 1963. (PCR, p. 438.)

21. That during the calendar year 1963 Klein's Sporting Goods, Inc., 4540 West Madison Street, Chicago 24, Illinois, was a licensed dealer in firearms and held license No. 36–2601 issued pursuant to Section 903, Title 15, United States Code, a part of the Federal Firearms Act.

22. That Klein's Sporting Goods, Inc., Chicago, Illinois, kept records required by Section 903(d) of Title 15, United States Code, and as to the respondent rifle these records showed such firearm as shipped to A. Hidell, P. O. Box 2915, Dallas, Texas.

23. Attached hereto as Exhibits 13, 14, and 15 are true and correct copies of records of the sale of the rifle made by Klein's Sporting Goods, Inc.

24. That during the calendar year 1963, Seaport Traders, Inc., 1221 South Grand Avenue, Los Angeles, California, was a licensed dealer in firearms and held license No. 95–1437 issued pursuant to Section 903, Title 15, United States Code, a part of the Federal Firearms Act.

25. That Seaport Traders, Inc., Los Angeles, California, kept records required by Section 903(d) of Title 15, United States Code, and as to the respondent pistol these records showed such firearm as shipped to A. J. Hidell, P. O. Box 2915, Dallas, Texas.

26. Attached hereto as Exhibits 8, 9, 10, and 11 are true and correct copies of records of the sale of the pistol made by Seaport Traders, Inc., a mail order division of George Rose and Company.

27. The rifle and the pistol shown above as shipped to Hidell were actually

received by the individual generally known as Lee Harvey Oswald. (PCR, pp. 128, 171.)

28. The rifle was used by Lee Harvey Oswald in the assassination of President Kennedy and the pistol was used by Lee Harvey Oswald in killing a Dallas Police Officer. (PCR pp. 19, 20, 129, 176.)

29. On December 31, 1964, Marina N. Oswald, widow of Lee Harvey Oswald, individually and as community survivor, sold to John J. King all right, title and interest which she had in and to the rifle and pistol for and in consideration of Five Thousand Dollars ($5,000.00) paid by buyer to seller. A true and correct copy of that Bill of Sale and Contract covering this transaction is attached hereto as Exhibit 16.

30. That on March 25, 1965, Marina N. Oswald, individually and as community administratrix of the Estate of Lee Harvey Oswald, sold to John J. King all right, title, and interest over which she had power of sale as such administratrix in and to the rifle and pistol for and in consideration of an additional Five Thousand Dollars ($5,000.00) that day paid by buyer to seller. A true and correct copy of that Bill of Sale and Contract covering this transaction is attached hereto and marked Exhibit 17.

31. At the time of the purchases by John J. King, referred to in stipulation Nos. 29 and 30 above, John J. King knew that the rifle and pistol were in the possession of agents of the United States. At the time of the purchases referred to in stipulation Nos. 29 and 30, John J. King had no actual notice or actual knowledge of a claim of title thereto by the United States.

32. At no time prior to publication of the notice of seizure of the pistol and rifle and the forfeiture proceedings on or about August 16, 1965, had the United States or any of its representatives ever asserted to claimant, John J. King, any claimed right of forfeiture.

33. On May 24, 1965, John J. King filed an action for the recovery of the rifle and pistol in the United States District Court for the District of Colorado. True copies of the Complaint, Defendant's Motion to Dismiss Plaintiff's Complaint, or alternatively to stay further proceedings, and the order dated October 8, 1965, in that action are attached and marked Exhibit 18.

34. On or about June 17, 1965, the Attorney General of the United States submitted to the Vice President and the Speaker of the House of Representatives a proposed bill to authorize him to condemn the rifle and the pistol and other items of evidence introduced before the President's Commission.

35. That on or about August 4, 1965, the Alcohol and Tobacco Tax Division of the Internal Revenue Service determined to commence forfeiture proceedings against the rifle and the pistol. The forfeitability of these firearms had been considered by the Department of Justice and the Treasury Department in considering methods of preserving these firearms for historical purposes. The Department of Justice filed a memorandum in John J. King's Denver action stating, in part as follows:

"This forfeiture proceeding had previously been withheld upon the hope that the prosecution of the present action could be postponed pending enactment of H.R. 9545. If plaintiff has any lawful property interest in the firearms, he could then have been paid just compensation. Plaintiff, however, has vigorously opposed defendant's efforts to continue this action and it thereby became necessary for Internal Revenue to file its proceeding."

36. That at the time of the sale and delivery of the rifle and of the pistol by the licensed firearms dealers, such dealers had no knowledge or reason to suspect that the person to whom such weapons were shipped had any name other than that shown in the order forms.

37. That since seizure of the rifle and of the pistol on November 22, 1963, such firearms have continuously remained in custody of the President's Commission or of units of the Federal Government or

of the City of Dallas, Texas, as shown in stipulation No. 6 above. These firearms at no time have been released to anyone for nongovernmental use.

38. In an interview on or about August 15, 1963, Lee Harvey Oswald falsely informed a Special Agent of the Federal Bureau of Investigation that, since he had received his membership card in the New Orleans Chapter of the Fair Play for Cuba Committee, he had spoken with "Hidell" on several occasions on the telephone. He also stated that he had never personally met "Hidell." (Hearing before President's Commission on the Assassination of President Kennedy, Vol. XVII, Exhibit 826, page 759.)

39. During an interview on or about August 17, 1963, by William Kirk Stuckey of New Orleans radio station WDSU, Lee Harvey Oswald falsely stated that he, Oswald, was not president of the New Orleans Chapter of the Fair Play for Cuba Committee, but was the secretary and that "this other gentleman, Hidell, was the president." Lee Harvey Oswald then exhibited his. membership card showing Oswald as secretary and Hidell as president. (PCR, p. 729, Hearings Vol. XI, page 162.)

40. On November 24, 1963, Lee Harvey Oswald told Captain Will Fritz, Dallas Police Department, that he, Oswald, did not know anyone by the name A. J. Hidell, and he, Oswald, falsely told Captain Will Fritz that he had never used the name "A. J. Hidell" as an alias. During the course of that interview Lee Harvey Oswald stated to Captain Will Fritz of the Dallas Police Department that he did not know anyone by the name "A. J. Hidell" and he falsely stated that he had never heard of the name before. (PCR, page 636.)

41. The rifle and pistol were acquired by Lee Harvey Oswald during his marriage to Marina N. Oswald.

42. The information set forth on pages 741 through 745 of the President's Commission Report correctly shows the financial situation of Lee Harvey Oswald during the period covered so far as can be ascertained.