97 N.J. Super. 458 (1967)
235 A.2d 247
STATE OF NEW JERSEY, PLAINTIFF,
v.
JOSEPH V. MORIARTY, DEFENDANT. FRANK J. FARLEY, TREASURER OF THE COUNTY OF HUDSON, AND COUNTY OF HUDSON, PETITIONERS,
v.
$168,400.97, RESPONDENT. STATE OF NEW JERSEY, BY ARTHUR J. SILLS, ATTORNEY GENERAL OF NEW JERSEY, PLAINTIFF,
v.
FRANK J. FARLEY, TREASURER OF THE COUNTY OF HUDSON, AND COUNTY OF HUDSON, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided October 20, 1967.
*464 Mr. Isidore Glauberman, special counsel, for petitioners (Mr. William F. Kelly, Jr. County Counsel, attorney for petitioners; Mr. Glauberman and Mr. Sheldon A. Weiss on the brief).
Mr. Vincent J. Commissa, First Assistant United States Attorney, for defendant (Mr. David M. Satz, Jr. United States Attorney, attorney for the District Director of Internal Revenue and the United States of America; Mr. Vincent J. Commissa, First Assistant United States Attorney, on the brief).
ROSEN, J.S.C.
This is a proceeding on an order to show cause why moneys seized from a private garage in Jersey City, New Jersey, and belonging to a convicted gambler should not be forfeited to Hudson County as contraband. Pursuant to N.J.S. 2A:152-9 the county seeks to obtain a formal decree or judgment declaring the moneys so seized forfeited to the county as property used in a criminal activity.
Before determining the issues involved in this controversy it is well to review the background of the previous litigation relating to the same subject matter.

HISTORY OF THE PROCEEDINGS
On February 13, 1964 the petitioners[1] filed a complaint and affidavit in the Hudson County Court and pursuant to N.J.S. 2A:152-9 obtained an order to show cause returnable March 13, 1964 why $168,400.97 in currency seized on July 6, 1962 from a private garage in Jersey City should not be forfeited to Hudson County as contraband because it was used by Joseph V. Moriarty, a convicted gambler, in his illegal gambling operations.
*465 The complaint and affidavit alleged that: (1) on July 6, 1962 the sum of $168,400.97, as well as numerous articles of gambling paraphernalia, all belonging to Joseph V. Moriarty, were seized and taken from the said garage as a result of a raid conducted by the county prosecutor and members of the Jersey City Police Department; (2) the Hudson County grand jury thereafter indicted Moriarty for violating the State's gambling laws; (3) on June 3, 1963 Moriarty pleaded guilty to a count of that indictment charging him with violating N.J.S. 2A:121-3(b) (possession of lottery slips); (4) more than six months had elapsed from the entry of the plea to the commencement of the proceeding; (5) the subject currency was used by Moriarty in connection with his illegal gambling operation and was the proceeds thereof, and (6) claims had been asserted to all or part of the moneys by the District Director of Internal Revenue, by E. Richard Freeman, owner of the garage at which the raid was conducted; and by Jersey City.
On February 14, 1964 the order to show cause, affidavit and complaint were duly served upon Moriarty by personal service at the State Prison in Trenton. The other claimants were served by certified mail, in accordance with the order to show cause.
Before the return date of the order to show cause the State of New Jersey, by the Attorney General, filed an action against petitioners in the Superior Court, Chancery Division, asserting that the State was entitled to the money as "unclaimed" property. By order dated March 9, 1964 these two actions were consolidated. The order provided that the matter was to be heard in the Superior Court, Law Division.
Before the matter came on for hearing, the District Director filed a petition removing the consolidated actions to the United States District Court for the District of New Jersey. The District Director then filed an answer and a counterclaim in which judgment was sought that the moneys be surrendered to the United States in "response" to a *466 levy made on May 29, 1963 pursuant to a lien arising on May 10, 1963 against the property of Moriarty for unpaid income taxes and interest. Thereafter, petitioners applied to the federal court for an order remanding the proceedings to the state court on the grounds that the action was improvidently removed in the first place. By order dated April 5, 1967 petitioners' motion was granted and the proceedings were remanded to the Superior Court, Law Division.
At the pretrial conference the court was advised that Jersey City and Freeman, both of whom had based their claims on the contention that the money was "unclaimed," had voluntarily withdrawn from the case. At the hearing the State withdrew its claim that it was entitled to custody of the money under the Custodial Escheat Act, N.J.S. 2A:37-29 et seq., and, alternatively, that it had become the owner of the property under the common law doctrine of bona vacantia. Remaining in the litigation are the petitioners District Director of Internal Revenue and United States of America.

FINDINGS OF FACT
At or before the time for hearing petitioners County Treasurer Stapleton and Hudson County, and claimants District Director of Internal Revenue and United States of America, by their respective counsel stipulated and agreed to many of the facts. In addition thereto, the court received and marked certain exhibits in evidence and heard testimony of several witnesses in open court. Based upon the stipulation, exhibits and testimony adduced at the hearing, the court's findings of fact are as follows:
1. Moriarty has a criminal record dating from the 1930's, pertaining to his violation of the gambling laws of the State of New Jersey. By common repute, he was the kingpin of the "numbers racket" in and around Jersey City.[2]
*467 2. On July 28, 1960 Moriarty was arrested and subsequently indicted by the Hudson County grand jury for possession of lottery slips (indictment 313-61). On January 16, 1962 he pleaded guilty to that indictment, and bail was continued pending sentencing.
3. On February 20, 1962, while he was free on bail, he was again arrested and charged with possession of lottery slips. His bail was immediately revoked and he was committed to the county jail.
4. On March 2, 1962 he was sentenced to a 2-3-year term in the State Prison, pursuant to his aforesaid plea of guilty to indictment 313-61.
5. Moriarty remained in custody continuously from February 20, 1962 throughout the rest of 1962, and for a considerable time thereafter. He was in the State's custody until March 12, 1964 when he was released to the United States marshal, and was in federal custody until January 6, 1965.
6. On July 3, 1962 several workmen, who were renovating private garages at 127-131 Oxford Avenue, Jersey City, discovered in an old car the sum of $2,438,110 in currency, numerous articles of gambling paraphernalia, as well as letters, papers, etc. belonging to Moriarty. The currency was turned over to the federal authorities.
7. Thereafter, on July 6, 1962 members of the Jersey City Police Department forcibly entered garage No. 56 at 47-61 Oxford Avenue and recovered numerous shopping bags and a cardboard box containing lottery slips, other gambling paraphernalia, and $168,400.96 in currency, all of which was taken into custody as gambling moneys and equipment as shown by the return of a search warrant issued by the assignment judge of Hudson County.
*468 8. Garage No. 56 is in close proximity to the garage in which the $2,438,110 had been found on July 3, 1962, and the law enforcement officials (members of the Jersey City Police Department) discovered the existence of the above-described gambling paraphernalia, including money, in garage No. 56 on July 6, 1962 as a direct result of a general investigation of the area triggered by the July 3, 1962 discovery.
9. On July 12, 1962 Moriarty was indicted by the Hudson County grand jury on a multi-count indictment charging him with violating the State's gambling laws (indictment 999-61).
10. On June 3, 1963 Moriarty pleaded guilty to the 43rd count of that indictment, charging him with violation of N.J.S. 2A:121-3(b) (possession of lottery slips) on divers dates from December 14, 1961 to July 6, 1962, inclusive. The lottery slips confiscated from the garage on July 6, 1962 reflected bets taken by Moriarty on various dates between December 14, 1961 and February 19, 1962, inclusive.
From February 20, 1962 Moriarty was continuously in official custody, and his illegal gambling operation ceased on February 19, 1962.
11. Petitioners commenced the present action more than six months after the entry of the record of conviction pursuant to Moriarty's plea of guilty to the 43rd count of indictment 999-61 on June 3, 1963.
12. On July 5, 1962 the District Director of Internal Revenue made a jeopardy assessment against Moriarty for income taxes and interest due and owing from him in the amount of $3,422,792.66. On July 9, 1962 at 2:10 P.M., the District Director caused to be served on Lawrence A. Whipple, the then Prosecutor of Hudson County, a notice of levy on the property and rights to the property belonging to the taxpayer (Moriarty), pursuant to the aforesaid assessment.
*469 The prosecutor, by letter addressed to the District Director dated September 17, 1962, stated that "The actual funds belonging to above named [Moriarty] were never in my possession."
13. On the evening of July 6, 1962, pursuant to the instructions of the county prosecutor, the aforesaid sum of $168,400.97 was placed in a safe deposit box at the branch office of the Hudson County National Bank located in the City of Bayonne, Hudson County, for safekeeping until Monday, July 9, 1962 when it could be transferred to a deposit account in the branch office of said bank located at 40 Journal Square, Jersey City, Hudson County.
14. On July 9, 1962 the aforesaid currency was transported, under the custody of the police officials, from the Bayonne branch of said bank to the branch office at 40 Journal Square, Jersey City. On July 10, 1962 said moneys were placed in a deposit account in said bank in the name of "Jersey City Police Department, William V. McLaughlin, Director of Police, Austin J. Conley, Chief of Police, as agent," bearing account No. 87312.
15. On April 22, 1963 the Hudson County Treasurer and the Hudson County Prosecutor filed an action in the Superior Court, Law Division, Hudson County, wherein they sought judgment ordering defendants McLaughlin and Conley to instruct defendant Hudson County National Bank to change the designation of the depositor of said account No. 87312 to "Frank J. Farley, Treasurer of Hudson County." Thereafter, defendants McLaughlin and Conley filed an answer wherein they denied that a "raid" was conducted and that the moneys were "seized," and alleged that the said moneys were "found." Attached to said answer was an affidavit executed by said Conley, as chief of police. Thereafter, on May 1, 1963 a stipulation of dismissal without prejudice was filed in said action.
16. By letter dated July 10, 1963 McLaughlin and Conley instructed the Hudson County National Bank to change the *470 designation of the depositor of said account No. 87312 to "Frank J. Farley, Treasurer of the County of Hudson."
17. At the grand jury proceedings which resulted in the aforesaid indictment 999-61, the subject currency was not exhibited to the grand jury, the currency being at that time in a vault in the Journal Square office of the Hudson County National Bank, or deposited in the account above referred to. (Finding No. 14)
18. Herbert Zuckerman prepared and filed on behalf of Moriarty an income tax return for the year 1962. In said return Moriarty reported $169,000 as his income for that year.
19. On or about October 20, 1964 Moriarty was served in prison by the District Director with a notice of deficiency assessment against him in the amount of $8,862,678.95 on account of nonpayment of the 10% excise tax on gross wagers imposed by 26 U.S.C., § 4401, together with the assessment and supporting schedules. The said notice asserted that Moriarty had been accepting wagers continuously from January 1, 1956 through February 19, 1962, inclusive.
20. On or about October 20, 1964 the District Director in writing advised Moriarty of a notice of deficiency assessment against him for nonpayment of federal occupational taxes on gambling, imposed under 26 U.S.C., §§ 4411 and 4412, for the period January 1, 1956 to June 30, 1962, inclusive.
21. On September 6, 1962 a levy for the sum of $771,802.55 was served by the District Director on the Hudson County National Bank, the Jersey City Police Department, Chief of Police Conley and Director McLaughlin, which levy represented a claimed tax obligation of Moriarty. On July 9, 1962 a notice of this levy had been served on the prosecutor. (Finding No. 12)

CONCLUSIONS OF LAW
The Internal Revenue Service contends that the assessment of July 5, 1962 operates as a lien upon all of Moriarty's *471 property, and consequently the Moriarty gambling money seized on July 6, 1962 by the local enforcement authorities was burdened with that lien.
The United States claims a valid lien for taxes pursuant to 26 U.S.C., § 6321, which provides:
"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."
The period of that lien is set forth in 26 U.S.C., § 6322:
"Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed * * * is satisfied or becomes unenforceable by reason of lapse of time."
The lien attaches to the taxpayer's property interests at the time the assessment list is received by the district collector. United States v. Sullivan, 333 F.2d 100 (3 Cir.1964); Spagnuolo v. Bonnet, 16 N.J. 546, 555 (1954)
The United States Supreme Court has sustained the priority of federal tax liens over liens under state law where the state lien may be viewed as inchoate when the tax lien is perfected. United States v. Acri, 348 U.S. 211, 75 S.Ct. 239, 99 L.Ed. 264 (1955); United States v. Liverpool & London & Globe Insurance Co., 348 U.S. 215, 75 S.Ct. 247, 99 L.Ed. 268 (1955); United States v. White Bear Brewing Co., 350 U.S. 1010, 76 S.Ct. 646, 100 L.Ed. 871 (1956); United States v. Security Trust & Savings Bank, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950). Based upon the authorities cited, the question to be resolved is whether the gambling moneys belonged to Moriarty at the time the Government perfected its lien claim. Stated another way, does the District Director have the right to enforce a federal income tax lien against gambling moneys which are contraband under state law?
*472 It is well settled that the Government's rights can rise no higher than or extend beyond the taxpayer's interest or property rights in the property sought to be levied upon. Central Surety & Insurance Co. v. Martin Infante Co., 164 F. Supp. 923, 927 (D.N.J. 1958), affirmed 272 F.2d 231, 234 (3 Cir. 1959); United States v. Winnett, 165 F.2d 149, 151 (9 Cir. 1947); Spagnuolo v. Bonnet, supra 16 N.J., at p. 560; Bankers Title & Abstract Co. v. Ferber Co., 15 N.J. 433, 441 (1954). A fortiori, when the District Director levies upon property or rights to property which do not belong to the delinquent taxpayer, the levy is void. Raffaele v. Granger, 196 F.2d 620 (3 Cir. 1952); Stuart v. Willis, 244 F.2d 925, 929 (9 Cir. 1957). The crucial inquiry, then, is whether Moriarty had any property rights in the subject currency to which the Government's tax lien could attach.
In the application of a federal revenue act state law controls in determining the nature of the legal interest which the taxpayer has in the property. The United States Supreme Court in Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960), held that:
"The threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had `property' or `rights to property' to which the tax lien could attach. In answering that question, both federal and state courts must look to state law, for it has long been the rule that `in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property * * * sought to be reached by the statute.' Morgan v. Commissioner of Internal Revenue, 309 U.S. 78, 82, 60 S.Ct. 424, 84 L.Ed. 585, 589. Thus, as we held only two Terms ago, Section 3670 `creates no property rights but merely attaches consequences, federally defined, to rights created under state law * * *.' United States v. Bess, 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135, [1140.]" (at pp. 512, 513, 80 S.Ct., at p. 1280)
There is a distinction between a common law or judicial forfeiture and a legislative or statutory forfeiture. A common law or judicial forfeiture does not operate or *473 take effect until, by a proper judgment in a suit instituted for that purpose, the rights of the state or Government have been established, but in a case of a statutory or legislative forfeiture, the forfeiture takes place at the commission of the offense. In the case of a legislative or statutory forfeiture the rights of the state, after judicial determination, date back to the time of the offense. There is a further distinction between the two types of forfeitures. In the common law type of forfeiture the actions are in personam for a money judgment against defendant, while suits upon the legislative forfeitures are in rem, not against the owner or possessor of the property but against the property itself, which is treated as the real offender. In either event, the primary object of the proceeding is to obtain judicial declaration of the forfeiture. The common law forfeiture results in a money judgment against a defendant, while the legislative forfeiture results in a decree confirming title. In either situation, however, judicial proceedings or the special statutory equivalent thereof are essential to provide the due process without which the original owner cannot be deprived of his property. People v. Broad, 216 Cal. 1, 12 P.2d 941, 942 (Sup. Ct. 1932) certiorari denied People of State of California v. General Motors Acceptance Corp., 287 U.S. 661, 53 S.Ct. 220, 77 L.Ed. 570 (1932); People v. Grant, 52 Cal. App.2d 794, 127 P.2d 19 (D. Ct. App. 1942); City of Bakersfield v. Miller, 46 Cal. Rptr. 661, 676 (D. Ct. App. 1965). In United States v. Stowell, 133 U.S. 1, 10 S.Ct. 244, 33 L.Ed. 555 (1890), the court stated:
"By the settled doctrine of this court, whenever a statute enacts that upon the commission of a certain act specific property used in or connected with that act shall be forfeited, the forfeiture takes effect immediately upon the commission of the act; the right to the property then vests in the United States, although their title is not perfected until judicial condemnation; the forfeiture constitutes a statutory transfer of the right to the United States at the time the offense is committed; and the condemnation, when obtained, relates back to that time, and avoids all intermediate sales and alienations, even to purchasers in good faith." (at pp. 16, 17, 10 S.Ct., at p. 247; emphasis supplied) *474 See also De Bonis v. United States, 103 F. Supp. 123, 126 (D.C. Pa. 1952); United States v. One 6.5 mm. Mannlicher-Carcano Military Rifle, etc., 250 F. Supp. 410, 415 (D.C.N.D. Tex. 1966); 23 Am. Jur., Forfeitures, § 9, P. 607.
The authority for seizure of gambling contraband in New Jersey is N.J.S. 2A:152-6. Although this statute does not expressly refer to money, it has been held that gambling moneys are subject to seizure and forfeiture under the statute. Spagnuolo v. Bonnet, 16 N.J. 546, 556-557 (1954); State v. Link, 14 N.J. 446, 452 (1954); Kenny v. Wachenfeld, 14 N.J. Misc. 322 (Sup. Ct. 1936). The statute was enacted to discourage and prevent unlawful gambling. State v. Link, supra, 14 N.J., at p. 453.
Statutes enacted to prevent unlawful criminal acts should be considered as enacted for the public good and to suppress a public wrong, and therefore, although they impose penalties or forfeitures, should not be construed, like penal laws generally, strictly in favor of defendant, but they are to be fairly and reasonably construed, so as to carry out the intention of the legislature. United States v. Stowell, supra, 133 U.S., at p. 12, 10 S.Ct. 244.
Petitioners rely upon Spagnuolo v. Bonnet, supra, as authority for its thesis that the gambling moneys seized on July 6, 1962 are contraband and, therefore, title to the same was vested in Hudson County not later than February 19, 1962, more than four months before the Government asserted its lien.
The facts in Spagnuolo reveal that on March 2, 1951 the police confiscated $50,000 in cash from a safe in the bedroom of the Newark residence of Edward Spagnuolo, whom they suspected of running a lottery. They also confiscated number slips and other gambling paraphernalia found elsewhere in the bedroom. Spagnuolo was not present during the raid. However, he was subsequently arrested and indicted by the Essex County grand jury for violating R.S. 2:135-3 (now N.J.S. 2A:112-3). He pleaded non vult *475 and was sentenced to prison on June 20, 1951. In the interim, the Internal Revenue Service perfected a lien for income taxes against the gambler. A jeopardy assessment against Spagnuolo was made on May 20, 1951 and on the following day a notice of lien and levy was served on the Essex County Sheriff, to whom the money had been turned over pending Spagnuolo's arrest and indictment.
Thereafter Spagnuolo's mother sued the sheriff, claiming that the money belonged to her rather than to the gambler. The sheriff filed a counterclaim for interpleader, naming the gambler, the county treasurer and the United States of America as parties interested in the fund in his possession.
The substantive claims of Essex County and the United States were asserted by way of answer and counterclaim to the interpleader. The county asserted that the money had been forfeited to it as gambling contraband, that the forfeiture took effect at the commission of the unlawful act, and therefore the United States' subsequent attempt to attach a tax lien to the fund was a nullity. The United States, on the other hand, asserted that its lien was entitled to "priority" because the county had nothing more than an "inchoate lien" until the entry of an order of forfeiture, or at least until Spagnuolo's conviction pursuant to his plea of non vult.
Spagnuolo failed to answer or otherwise appear, and judgment by default was entered against him. After a trial the court entered judgment awarding the fund to the county, holding that (1) the money belonged to the gambler, not his mother, and (2) at the time the Government's tax lien arose, title to the money had already been forfeited to the county.
The mother and the United States appealed. Our Supreme Court affirmed the judgment. As to the appeal of the United States, the Supreme Court first observed that seizure and confiscation of money used in connection with a gambling operation is authorized by and made pursuant to N.J.S. 2A:152-6, the "clear intention" of which is to provide for *476 an "absolute seizure and immediate confiscation [of gambling paraphernalia, including money], together with a declaration that property so seized shall be considered contraband." (16 N.J., at p. 556). The court then noted that N.J.S. 2A:152-7 through 11 (L. 1941, c. 70) was enacted as a supplement to the "basic" statute (N.J.S. 2A:152-6), and the purpose of the supplement was merely to establish a proceeding in which, after conviction or acquittal of the offender, a claim of property to contraband moneys could be litigated in a summary manner. The court held that the language of the supplement could not be intended "to have the effect of leaving the legal title to such money in the gambler or player", the intention of the Legislature being merely to "establish a rule of evidence, by a prima facie presumption to be used in the trial of any claim of property" to the funds in question. Id., at pp. 558-559.
The court rejected the Government's contention that the county had nothing more than an "inchoate lien" prior to conviction, or prior to the entry of judgment of forfeiture, stating:
"In the trial below the owner, by his default, admitted that as far as his title and possession was concerned the money was contraband. * * * The trial court, on the proofs offered, declared the money to be contraband and entered the confirming judgment of forfeiture under the statute. He had no other alternative. Where a forfeiture is absolute under the statute, as it is here, the judgment of condemnation or forfeiture when entered relates back to the commission of the wrongful act and takes date from the wrongful acts, not from the date of sentence or decree. * * *
The established rule is that the forfeiture becomes absolute at the commission of the prohibited acts and the title from that moment vests in the state or government in all cases where the statute in terms denounces the forfeiture of the property as a penalty for a violation of the law, * * * and that in all such cases it is not in the power of the offender or the former owner to defeat the forfeiture by any subsequent transfer of the property, even as to a bona fide purchaser for value, without notice of the wrongful acts done or committed by the former owner. The forfeiture is considered as directed against the thing itself, not merely the possessor's interest in it. * * *
*477 Therefore, we must conclude that at the time the jeopardy assessment was attempted to be levied against the particular monies in this case, seized under the circumstances in which they were, title to the property was then in the County of Essex. At the most the federal lien could only attach to Edward Spagnuolo's inchoate right to sue for the return of the funds in the event of his acquittal and not to the confiscated funds themselves. The federal lien can rise no higher than the rights of the taxpayer. * * *
The title and possession of the County of Essex was not that of a creditor or a judgment creditor but a title and possession acquired by an exercise of sovereign power * * *." (Id., at pp. 559-560; emphasis supplied; citations omitted)
The District Director urges this court to distinguish the holding in Spagnuolo. It is true that in Spagnuolo the seizure of the gambling moneys occurred prior to the Government's perfected lien, whereas in this case the lien was perfected on July 5, 1962 and the seizure took place on July 6, 1962. This factual distinction does not in any way impair the validity or application of the substantive law recognized by all authorities, including Spagnuolo, that the purpose of a forfeiture proceeding is to perfect the sovereign's title to the seized contraband. The sovereign's right to title and possession is determined by the absolute forefeiture provided by statute.
N.J.S. 2A:152-6 creates a statutory or legislative forfeiture and not a common law or judicial forfeiture. It proceeds against the property and not the individual. An illustration of a common law forfeiture may be found in N.J.S.A. 1:3-10, which provides that:
"A county treasurer or township clerk failing to perform any of the duties required of him by sections 1:3-8 and 1:3-9 of this title shall, for each offense, forfeit the sum of ten dollars, recoverable, for the use of the county, by an action at law in any court of competent jurisdiction, by the director of the board of chosen freeholders of the county wherein the treasurer or clerk may reside."
Title to the money under the above statute does not pass to the county until there is a judicial determination of the forfeiture. The statute does not automatically *478 create the forfeiture. N.J.S. 2A:152-6, as judicially determined, provides for an absolute forfeiture which takes effect from the date of the commission of the wrongful act. At the time of the wrongful acts (not later than February 19, 1962) the gambling moneys vested eo instanti in the Hudson County, and Moriarty had no property interest in the currency.
In light of all the evidence the court determines that the sum of $168,400.97 is the product of gambling and was used by Moriarty in connection with his illegal numbers operation, and that the currency was earmarked or segregated for gambling purposes. These conclusions are predicated upon the following:
1. Moriarty's prior criminal record.
2. As a result of a valid search warrant the subject currency together with lottery slips and other gambling paraphernalia were found in the garage at 47-61 Oxford Avenue, Jersey City.
3. Moriarty's plea of guilty to indictment 999-61.
4. Moriarty received the money and held it for use in connection with his illegal numbers operation.
5. Moriarty by his default in this case has admitted "as far as his title and possession was concerned the money was contraband." (Spagnuolo v. Bonnet, supra, 16 N.J., at p. 559).
The return endorsed on the search warrant, July 6, 1962, discloses that the money was taken from the garage by local law enforcement officials and confiscated as gambling contraband. On said date Moriarty was in official custody and incarcerated in the State Prison. The court concludes that the requirements of N.J.S. 2A:152-7 has been fulfilled in that the subject currency was seized in connection with an arrest for violation of the gambling laws of this State. State v. Link, supra, 14 N.J., at pp. 452-454.
The District Director and the Government further contend that this court lacks jurisdiction to hear and determine this in rem forfeiture action. The touchstone of the contention *479 is that the court has no actual or constructive possession of the res.
L. 1941, c. 70 (N.J.S. 2A:152-7 to 11) is entitled "An act concerning criminal procedure, and supplementing subtitle fourteen of Title 2 of the Revised Statutes." As previously noted, the substantive authority for seizure of gambling contraband is N.J.S. 2A:152-6, which had its genesis in L. 1898, c. 237, § 168, p. 923. It is clear that in adopting L. 1941, c. 70 the Legislature intended to establish a procedural system that would ensure and guarantee due process. Thus viewed, it must be concluded that strict conformity with a procedural statute is not a condition to the validity of the forfeiture or to this court's jurisdiction to render an in rem judgment affecting title to the subject currency.
The facts disclose that the res does reside within the jurisdiction of this court. The subject currency has been determined to be contraband and seized in connection with an arrest by law enforcement authorities. On the evening of July 6, 1962 (the same date the moneys were seized) and pursuant to the instructions of the county prosecutor, the aforesaid sum of $168,400.97 was placed in a safe deposit box at the Hudson County National Bank in Bayonne for safekeeping until Monday, July 9, 1962. On July 9 the subject currency was transported under the custody of the police officials from the Bayonne branch of said bank to the branch office at Journal Square. On July 10, 1962 the moneys were placed in a savings account in said bank in the name of the Jersey City Police Department, William V. McLaughlin, Director of Police, Austin J. Conley, Chief of Police, as agent.
On May 1, 1963 a stipulation of dismissal without prejudice was filed in the suit wherein the county officials sought judgment directing Jersey City officials to instruct the Hudson County National Bank to change the designation in the bank account to "Frank J. Farley, Treasurer of Hudson County." By letter dated July 10, 1963 the Jersey City *480 police officials instructed the Hudson County National Bank to change the designation of the depositor to "Frank J. Farley, Treasurer of the County of Hudson." The savings account passbook was physically delivered to the county treasurer. The passbook was marked in evidence and is in the actual possession of the court. The only reason this account was not transferred from McLaughlin and Conley to Farley was due to the notice of Moriarty's tax assessment served by the District Director on the Hudson County National Bank. The moneys, therefore, have been subject to the custody or control of law enforcement officials from July 6, 1962 until the filing of the complaint.
The Government's argument that the letter dated September 17, 1962, from the prosecutor to the District Director, constitutes an "abandonment of the seizure" is without merit. In that letter the prosecutor stated: "The actual funds belonging to above named [Moriarty] were never in my possession." This was not a waiver or abandonment of any supervision or duty which was required by law to be exercised by the prosecutor. It was a statement of a known fact. On the contrary, on July 12, 1962 the prosecutor wrote to the county counsel directing attention to the fact that the Hudson county grand jury had on said date returned indictments against Moriarty for engaging in the lottery business. He also stated, "the above amount of money [$168,400.97] was seized as contraband by this office and members of the Jersey City Police Department." * * * [I]n the meantime, will you please advise the County Treasurer to take the necessary steps to open an account in the above named bank [Hudson County National Bank] * * * and leave it on deposit in said institution until the court decides what should be done with it." This letter, read in connection with the September 17, 1962 letter, demonstrates that the Government's position is erroneous. The acts of the county officials did not release the subject currency to the control and possession of the city officials.
*481 The District Director and the Government take the position that the court lacks jurisdiction because the bank is not a party to the action and therefore the court cannot properly order the bank to act with respect to the savings account. The court has not been requested nor will it order the bank to do anything. From the evidence it is apparent that the bank will comply with the request of McLaughlin and Conley, agent, to transfer the savings account to the county treasurer of Hudson County when this litigation is terminated. The court concludes that it has jurisdiction to hear and determine this matter in accordance with the provision of N.J.S. 2A:152-9.
The District Director's final thrust, that this court has no jurisdiction to decide matters "affecting United States' tax lien," was rejected by the Federal District Court in holding that the proceedings be remanded to this court. This contention is also contrary to the holding in United States v. Bleasby, 257 F.2d 278 (3 Cir. 1958). That case was the aftermath of State v. Link, supra, 14 N.J. 446. After Link's conviction the county brought a forfeiture action under N.J.S. 2A:152-9. The District Director, having asserted a lien against the seized currency for Link's delinquent income taxes, was given notice of the proceedings, but chose not to participate. After our Supreme Court's affirmance of the Superior Court's judgment declaring the money forfeited to the county, the United States of America instituted an action against the county in the District Court to enforce its lien. The District Court held in favor of the Government. On appeal the Court of Appeals reversed, holding that (1) the state proceeding had been in rem, and (2) it was therefore res judicata in regard to the Government's claim and could not collaterally be attacked in a later independent suit. The court stated:
"In brief, the United States, as claimant of a tax lien on a fund, has had formal notice of a proceeding in a court with jurisdiction over that fund, to determine title to the res. Indeed, the United States was admonished to show cause why the fund should not be *482 forfeited to the state. And, it is familiar and normal procedure for the United States to undertake to vindicate its tax liens in suits instituted in state courts by some other claimants of rights in the property." (257 F.2d, at p. 281; emphasis supplied)
Although admittedly dictum it is significant that the Court of Appeals expressed doubt as to the position taken by the United States and the District Director in a factual setting analagous to the instant case.
"* * * [T]his case presents the special and unusual situation of the United States attempting to attach a tax lien to property actually in possession of the state after its seizure as contraband subject to forfeiture to the state. True, after seizure it still remained for the state to pursue the prescribed procedure for obtaining a formal decree of forfeiture. But this does not alter the fact that the United States has tried to impose a lien on property after it has passed into the actual possession of another government under sovereign claim of right to keep it in furtherance of the policy of its criminal laws. Thus, the United States is asserting an extraordinary power greater than and different from that involved in the cases above cited or any others upon which the United States relies. But we do not have to resolve the very real difficulties which this question presents, because this case can, and we think should be decided on another ground." (at pp. 279-280)

CONCLUSION
For the foregoing reasons the court determines that the sum of $168,400.97 be forfeited to the sole use and gain of Hudson County.
NOTES
[1] Subsequent to the commencement of this suit Frank J. Farley, Hudson County Treasurer, retired. Joseph Stapleton, the present petitioner, succeeded him as Treasurer.
[2] In United States v. Moriarity, 327 F.2d 345 (3 Cir. 1964), Moriarity, in appealing a conviction for engaging in the business of accepting wagers without having paid the federal occupational tax, challenged the sufficiency of the affidavit upon which the search warrant was issued. In holding that there was probable cause, the Court of Appeals relied in part on Moriarity's prior criminal record showing him to be a notorious numbers operator, the court stating that Moriarity had a "real background in the particular field" (p. 347), and that he was "old in the numbers racket" (p. 348).