**UNITED STATES of America,
Appellee,**

v.

**Bruce BRAVERMAN, Appellant.**

**No. 268, Docket 30841.**

United States Court of Appeals
Second Circuit.

Argued Jan. 24, 1967.

Decided April 4, 1967.

H. Elliot Wales, New York City, for
appellant.

George L. Barnett, Asst. U. S. Atty. (Joseph F. Hoey, U. S. Atty., for the Eastern District of New York, Brooklyn, N. Y., Joseph Lynch, Atty., Dept. of Justice, Brooklyn, N. Y., of counsel), for appellee.

Before MOORE and FRIENDLY, Circuit Judges, and BRYAN, District Judge.*

MOORE, Circuit Judge:

The appellant, Bruce Braverman, was convicted of causing the transportation in foreign commerce of eight counterfeit money orders, in violation of 18 U.S.C. § 2314 and 18 U.S.C. § 2. Six of the money orders bore his signature. The other two were signed and cashed by one Nuncia Miranda.

In March of 1963, Braverman cashed 39 money orders totalling $9,000 drawn on the Lafayette National Bank of Brooklyn at the money exchange firm of Aloysio Pelajo in Rio de Janeiro, Brazil. Mr. Pelajo testified that he had cashed money orders for Braverman on three different occasions in March of 1963, that ten money orders were cashed on the first visit, eleven on the second visit, and eighteen on the third. When the Pelajo firm presented the money orders for payment in New York, the Lafayette Bank refused to honor them because they were all counterfeit.

Braverman's defense was that he had cashed the money orders, but did not know they were counterfeit.

Braverman was arrested by the FBI at his apartment in Manhattan at 8:15 A.M. on August 21, 1963, pursuant to a warrant issued the previous day. He was immediately warned of his right to counsel and to remain silent. Before being taken to FBI headquarters, Braverman was given an opportunity to telephone a lawyer but, unable to reach him, left word with his roommate to keep trying. After fingerprinting and photographing Braverman, the FBI agents talked to him in the "interview" room for 29 minutes.

An FBI agent testified that during the interview, Braverman was shown the counterfeit money orders mentioned in the indictment and that Braverman explained that he had obtained them from Ben Jack Cage and Earl Bell, both of whom had asylum in Brazil. He claimed that Cage had a stack of the money orders one and one-half feet in height. When confronted with the money orders cashed by Nuncia Miranda, Braverman admitted that she was his girlfriend and that he had given her the money orders for her own use.

Braverman's signature on the fingerprint card was introduced in evidence. An FBI handwriting expert testified that the six money orders bearing Braverman's name and the fingerprint card were signed by the same person.

Upon appeal, Braverman's counsel raises many issues and urges that the adverse resolution thereof, individually and collectively, against Braverman constitutes reversible error.

*The Issues Raised*

(1) Whether Congress intended the combination of 18 U.S.C. §§ 2 and 2314 to apply to acts (such as Braverman's) committed solely in a foreign country but intended to have an effect in the United States;

(2) Whether the United States Constitution (the foreign commerce clause) permits Congress to punish acts done solely in a foreign country but intended to have an effect in the United States;

(3) Whether Braverman was subjected to an "unnecessary delay" before arraignment in violation of Rule 5(a) of the Federal Rules of Criminal Procedure;

(4) Whether the questioning of Braverman, after he said he had an attorney but before the attorney arrived, violated his Sixth Amendment right to counsel;

(5) Whether the trial judge abused his discretion in allowing the government to introduce evidence that Braverman had cashed thirty-nine (39) counterfeit money orders at Pelazo's firm, when only

---

* From the Southern District of New York, sitting by designation.

six money orders were alleged in the indictment;

(6) Whether introducing the fingerprint card, with Braverman's signature on it violated either his Fifth Amendment privilege against self-incrimination, or his Sixth Amendment right to counsel;

(7) Whether Braverman's admission that he knew Nuncia Miranda and had given her two money orders was sufficiently corroborated to support the conviction on counts 7 and 8 (alleging that he had caused the transportation in foreign commerce of the counterfeit money orders cashed by Nuncia Miranda).

*Jurisdiction*

In Londos v. United States, 240 F.2d 1 (5th Cir.) cert. denied 353 U.S. 949, 77 S.Ct. 860, 1 L.Ed.2d 858 (1957), the same statutes involved in this case (18 U.S.C. §§ 2314 & 2) were held to apply to defendants who, while acting solely in Mexico, caused someone else to transport worthless securities into this country (i. e., in foreign commerce). In that case the defendants contended, unsuccessfully, that since all acts were done in Mexico, the United States had no legislative jurisdiction.

While attempting to ascertain Congressional intent with respect to the international application of the Sherman Act, this court in United States v. Aluminum Co. of America, 148 F.2d 416, 443, per L. Hand, C. J., observed:

"* * * it is quite true that we are not to read general words, such as those in this Act, without regard to the limitations customarily observed by nations upon the exercise of their powers * * *.

* * * * * *

"On the other hand, it is settled law * * * that any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends * * *."

█ There would seem to be no logical reason for holding that Congress intended to punish those who cause the violation of a law regulating and protecting foreign commerce only when they act within the borders of the United States or that Congress is powerless to protect foreign commerce and those who engage in foreign commerce from intentionally injurious acts, simply because those acts occur outside our borders. Braverman knew, when he cashed the money orders and gave Miranda two for the same purpose, that he was putting them into foreign commerce because, of necessity, they had to be ultimately paid in Brooklyn, New York.

*Pre-Arraignment Delay*

█ After arrest, and before arraignment, the FBI questioned Braverman for 29 minutes between 9:35 A.M. and 10:04 A.M. During this time, Braverman told the FBI agents that he had given the money orders to Nuncia Miranda, and that he had obtained the money orders from Ben Jack Cage. Braverman asserts that the post-arrest-pre-arraignment delay violated Rule 5(a) because the arrest was made pursuant to a warrant, and "the existence of the warrant foreclosed a necessity, and even the power, of the arresting agent, to delay the arraignment, and subject the appellant to a period of in-custody interrogation." (Appellant's brief.) Hence, he argues, the admission as evidence at trial of the statements he made during the interrogation constituted reversible error under the rule of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

However, the cases do not support a sweeping rule that no pre-arraignment delay for questioning is permissible following an arrest pursuant to a warrant. See United States v. Ladson, 294 F.2d 535 (2d Cir.) cert. denied 369 U.S. 824, 82 S.Ct. 840, 7 L.Ed.2d 789 (1962) and United States v. Currie, 354 F.2d 163 (2 Cir.) cert. denied sub nom. Price v. United States, 384 U.S. 933, 86 S.Ct. 1450, 16 L.Ed.2d 534 (1966).

In United States v. Vita, 294 F.2d 524 (2d Cir.) cert. denied 369 U.S. 823, 82

S.Ct. 837, 7 L.Ed.2d 788 (1962), this court, per Lumbard, C. J., said:

> "The flexibility of the term 'unnecessary' reveals an intent to have the command take effect only if there is no overriding justification for the delay. * * *
>
> * * * * * *
>
> "We believe * * * that when needed for investigation rather than merely repetitious interrogation, reasonable detention is permissible so long as certain safeguards are observed." (p. 533)

In the present case, the questioning period was only 29 minutes, and Braverman was first warned of his right to counsel and his right to remain silent. The detention was reasonable, and the necessary safeguards were observed.

*Right to Counsel*

██ When the FBI agents arrested Braverman at his apartment, they warned him of his right to counsel and his right to remain silent. As Braverman's trial commenced before June 13, 1966, the requirements of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) do not apply, and the case is governed by the rule of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). In contrast to the *Escobedo* case, the prosecution here did nothing to interfere with Braverman's right or access to counsel. Braverman attempted to call a lawyer, but could not reach him. At FBI headquarters, Braverman was again advised of his rights before the questioning. Braverman's lawyer arrived at FBI headquarters at about 10:15 A.M. and was immediately allowed to see Braverman. The facts indicate that Braverman voluntarily answered all questions asked. There was no violation of his Sixth Amendment right to counsel.

*Evidence of Money Orders Not Mentioned in the Indictment*

██ The trial judge permitted the government to introduce testimony, by its first witness, that Braverman cashed 39 counterfeit money orders in March of 1963 although the indictment alleged only 6 money orders. The jury was cautioned that the rest were introduced as contemporaneous similar actions to show notice and intent. Admission of this testimony was not an abuse of discretion. Braverman relies on United States v. Byrd, 352 F.2d 570 (2d Cir. 1965) to show the contrary.

In the *Byrd* case, this Court said:

> "The admissibility of this kind of evidence is 'a matter in which the trial judge should be allowed a wide range of discretion.' [Citing cases] The exercise of discretion must be addressed to a balancing of the probative value of the proffered evidence * * * against its prejudicial character * *.
>
> * * * * * *
>
> "It is, of course, conceivable that in some cases proof of the offenses charged would contain little or nothing from which an inference of guilty intent could be drawn. In such a case a trial judge would, in the exercise of his discretion, be justified in admitting as part of the Government's case, proof of a prior similar offense to show knowledge or intent."

Here there was a need for the government to introduce evidence of intent (i. e., knowledge, on Braverman's part, that the money orders were counterfeit). The mere act of cashing one counterfeit money order, or possibly even six, might contain little to support the necessary proposition that the individual who cashed the money orders knew they were counterfeit. On the other hand, the likelihood that the one who handles 39 counterfeit money orders worth some $9,000.-00 within a short period of time knows the nature of the instruments he is cashing is substantially greater. The trial court acted properly in permitting the government to buttress intent by means of the contemporaneous similar acts.

The probative value outweighed the possible prejudice, and the trial court did not abuse its discretion in admitting the evidence.

*Braverman's Signature*

 In the past, handwriting has been considered a non-testimonial physical act, and hence outside the scope of the Fifth Amendment privilege against self-incrimination. United States v. Mullaney, 32 F. 370 (E.D.Mo.1887). This holding was recently acknowledged by the Supreme Court in Schmerber v. State of California, 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) in which the Court held that a compulsory blood test did not fall within the scope of the Fifth Amendment, and was permissible.[1] While the Court did not take a position whether handwriting samples were a communicative act, it did quote with approval from Holt v. United States, 218 U.S. 245, 252–253, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), where Mr. Justice Holmes rejected an argument that compelling an accused to model a blouse for purposes of identification violated the defendant's Fifth Amendment privilege, saying:

"[T]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof." 384 U.S. at 763, 86 S.Ct. at 1832.

We fail to see any significant distinction between making an accused raise his arms so that a trier of the facts can ascertain the correspondence of his torso with an incriminating garment and having him write his name so that a trier can determine the correspondence of his signature with an incriminating writing. In neither case is the accused compelled to give testimony, that is, to respond to questions regarding the circumstances of the crime or his participation in it. To such extent as Fitzsimmons v. United States (10 Cir. 1967), may hold otherwise, we do not agree with it. On the other hand, insofar as that decision rests upon a denial of Sixth Amendment rights, it is readily distinguishable, since there the signature was obtained by prison officials from a defendant who had been indicted, for whom counsel had been appointed and who was awaiting trial, see Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), whereas Braverman signed a fingerprint card while the investigation was still in course and before the criminal process had begun.

*Corroboration*

 In discussing the requirements for the corroboration of a confession or admissions in a criminal case, the Supreme Court has acknowledged[2] the rule that where the crime involves a tangible *corpus delicti*, it need only be shown that a crime was actually committed, i. e., as long as independent evidence establishes the *corpus delicti*, that evidence, plus an uncorroborated confession linking the defendant to the crime is sufficient to support a conviction. We feel the same rule should apply in a case such as this involving counterfeit money orders. Somebody counterfeited them and somebody caused them to travel (from Brazil to Brooklyn) in foreign commerce. That much is established by independent evidence. Braverman's admission that he had given them to Nuncia Miranda, corroborated by the money orders endorsed by Miranda, was sufficient to support his conviction as one who caused them to travel in foreign commerce.

Affirmed.

1. The Supreme Court has recently granted certiorari in a case where the petitioner is asserting that his right to counsel was violated when, after arrest and a request for counsel, an FBI agent took handwriting samples from the petitioner before any attorney had arrived. People of State of California v. Gilbert, 63 Cal.2d 690, 47 Cal.Rptr. 909, 408 P.2d 365, cert. granted 384 U.S. 985, 86 S.Ct. 1902, 16 L.Ed.2d 1003.

2. Wong Sun v. United States, 371 U.S. 471. 489, fn. 15, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); see also 7 Wigmore on Evidence § 2072.