UNITED STATES of America

v.

GOLDBERG, Ronald J., Appellant.

No. 86–1524.

United States Court of Appeals, Third Circuit.

Argued Feb. 19, 1987.

Decided Sept. 29, 1987.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Chief of Appeals, Ewald Zittlau (argued), Asst. U.S. Attys., Philadelphia, Pa., for appellee.

Thomas Colas Carroll (argued), Carroll & Carroll, Philadelphia, Pa., for appellant.

Before HIGGINBOTHAM and SLOVITER, Circuit Judges, and ROTH, District Judge [*].

## OPINION OF THE COURT

ROTH, District Judge:

Ronald Goldberg was convicted in the United States District Court for the Eastern District of Pennsylvania on three counts of wire fraud, under 18 U.S.C. § 1343 and § 2, and three counts of causing the transportation of stolen property in interstate or foreign commerce, under 18 U.S.C. § 2314 and § 2. These offenses were committed while Goldberg was imprisoned at the State Correctional Institution at Graterford, Pennsylvania. Goldberg put his scheme into operation on October 29, 1984, by depositing into his account at the North State Savings and Loan Corporation, Greenville, North Carolina (North State), a check in the amount of $230,000, drawn on an account in the name of Goldberg's corporation, Corporate Dynamics International, Inc. (Corporate Dynamics) at Smith, Barney, Harris, Upham and Company, Philadelphia, Pennsylvania (Smith Barney). Goldberg knew that there were not at that time sufficient funds in the Smith Barney Corporate Dynamics' account to cover the check.

The next day, October 30, Goldberg deposited a check for $230,000, drawn on his account at North State, in the Corporate Dynamics annuities account at American Guardian Life Assurance Company, Jenkintown, Pennsylvania (American Guardian). That same day, Goldberg arranged to have a check for $223,000, drawn on Corporate Dynamics' American Guardian account, deposited in Corporate Dynamics' name at Smith Barney. Goldberg was aware that there were not funds in the annuities account to cover the $223,000 check. On November 15, American Guardian was notified that there were insufficient funds to cover the check it had received from North State. However, in the meantime, American Guardian had cleared the $223,000 check, drawn on the annuities account at American Guardian and payable to the Corporate Dynamics account at Smith Barney.

On November 5, 1984, Goldberg telephoned Smith Barney and arranged to have $192,821 of the funds, now credited to Corporate Dynamics at Smith Barney, wired from Chemical Bank, New York, New York, to an account in the name of Corporate Dynamics at Wilmington Trust Company, Wilmington, Delaware (Wilmington Trust). Then on November 7, 1984, Goldberg called Wilmington Trust and instructed that bank to wire $190,000 to Goldberg's account at the Royal Bank of Canada, Montreal, Canada. Finally, after the receipt of the funds in Montreal, Goldberg telephoned from Graterford Prison to the Royal Bank of Canada on several occasions to arrange for the transfer of the $190,000 from Montreal to the Royal Bank of Canada in Nassau, Bahamas. Goldberg was requested by the bank to confirm these instructions in writing and did so. The Royal Bank of Canada then on November 13, 1984, wired the funds from Montreal to the Royal Bank of Canada International Limited in Nassau.

---

[*]  Honorable Jane R. Roth, United States District Judge for the District of Delaware, sitting by designation.

In December 1984, American Guardian, since it had become aware of the fact that there were not funds in the Corporate Dynamics' annuities account to cover the $223,000 check, had its attorney, Harold Semanoff, obtain an injunction, freezing any funds which Goldberg had on deposit with the Royal Bank of Canada. Once Goldberg was informed of the injunction, he cooperated with Semanoff to have the funds returned from Nassau to American Guardian. Altogether, with recovery from Wilmington Trust, Smith Barney, and the Royal Bank of Canada in Montreal and Nassau, American Guardian has recouped all but $21,408.63 of the $223,000 taken from it by Goldberg as a result of his scheme to defraud.[1]

Goldberg was indicted on three counts under 18 U.S.C. § 1343 and § 2[2] for causing Chemical Bank to transfer funds by wire to Wilmington Trust, for causing Wilmington Trust to transfer funds by wire to Royal Bank of Canada, Montreal, and for the telephone calls which caused Royal Bank of Canada, Montreal to transfer funds by wire to Royal Bank of Canada, Nassau. He was indicted on three counts under 18 U.S.C. § 2314 and § 2[3] for causing the transportation of fraudulently obtained money in interstate or foreign commerce, arising from the same three wire transfers of funds. He was found guilty, after a bench trial, on all six counts. He has appealed, claiming (1) that venue was not proper in the Eastern District of Pennsylvania, (2) that the electronic transfer of funds from one bank to another is not the equivalent of the transfer of "money" under 18 U.S.C. § 2314, and (3) that there was

no federal jurisdiction over the offenses charged in Counts Five and Six, the wire transfer of funds from Montreal to Nassau. We have jurisdiction of this appeal under 28 U.S.C. § 1291. The resolution of these issues involves the interpretation and application of legal precepts. Therefore, the scope of our review is plenary. *United States v. Adams,* 759 F.2d 1099 (3d Cir. 1985). We will affirm the conviction below on all counts.

## JURISDICTION

Defendant Goldberg contends that the district court did not have jurisdiction over Counts Five and Six because that wire transfer and transportation of funds was between two foreign cities, Montreal and Nassau. He asserts that "foreign commerce" under 18 U.S.C. § 1343 and § 2314 incorporates the definition of "foreign commerce" in 18 U.S.C. § 10: "The term 'foreign commerce', as used in this title, includes commerce with a foreign country." He argues that the wire transfer, alleged in Count Five, and the transportation, alleged in Count Six, do not come within the term "foreign commerce" because the United States was not a party to or involved in these transactions.

The question presented, however, appears to be more complex than merely the definition of "foreign commerce" under § 1343 and § 2314. First, we must determine if the jurisdiction of the federal district courts can be extended to include this wire transfer of stolen funds between two foreign cities, in a case in which this offense was caused by an American national, located in the United States, using the in-

---

1. The loss of $21,408.63 is apparently due to a drop in value of the Canadian dollar during the time that the Royal Bank of Canada held the funds in the form of Canadian dollars.

2. Section 1343 provides in relevant part:
   Whoever, having devised or intending to devise any scheme or artifice to defraud, ... transmits or causes to be transmitted by means of wire ... communication in interstate or foreign commerce, any ... signals, ... or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Section 2(b) provides:
   Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

3. Section 2314 provides in relevant part:
   Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

strumentability of innocent persons to bring about the wire transfer. If such jurisdiction exists, we must next consider whether or not there is adequate statutory provision, describing the offense charged against defendant Goldberg.

Traditionally, American courts have held that "under American law, jurisdiction in criminal matters rests solely with the legislative and judicial branches of government of the state or country in which the crime is committed." Blakesley, *A Conceptual Framework for Extradition and Jurisdiction Over Extraterritorial Crime,* 1984 Utah L.Rev. 685, 689.

> [T]he general and almost universal rule is that the character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done. For another jurisdiction, if it should happen to lay hold of the actor, to treat him according to its own notions rather than those of the place where he did the acts, not only would be unjust, but would be an interference with the authority of another sovereign, contrary to the comity of nations, which the other state concerned justly might resent.

*American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 356, 29 S.Ct. 511, 512, 53 L.Ed. 826 (1909) (citation omitted) (Holmes, J.).

Chief Justice Taft, however, in the case of a conspiracy, taking place on the high seas and in Brazil, to defraud a corporation in which the United States was a stockholder, distinguished *American Banana Co. v. United Fruit Co.* on the ground that it was a civil case, based on violation of the Anti-Trust Law in a foreign country and that Congress had failed to specify in the Anti-Trust Law that it was including punishment for such an offense in the event that it was committed outside the territorial jurisdiction of the United States.[4] In *United States v. Bowman,* 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922), Chief Justice Taft held that in cases of offenses against the opera-

tions of the Government of the United States, Congress need not have specified that extraterritorial jurisdiction existed before there could be prosecution in our courts for such crimes which had been committed on the high seas or in foreign countries. 260 U.S. at 98, 43 S.Ct. at 41. *See United States v. Layton,* 509 F.Supp. 212 (N.D.Cal.1981) (conspiracy to and aiding and abetting the murder of an American Congressman by an American citizen in Guyana has harmful effects within the U.S.; federal district court has jurisdiction over American citizens who commit this type of crime).

Turning from such direct offenses against the United States, as the making of false claims against it or the murder of its elected representatives, to the type of offenses with which defendant Goldberg has been charged here, wire transmission of stolen money, we find precedent for extending the jurisdiction of the federal courts to include offenses, wholly committed outside of this country, if the acts committed are intended to have an effect in the United States. In *United States v. Braverman,* 376 F.2d 249 (2d Cir.1967), Bruce Braverman had been convicted of causing the transportation in foreign commerce of eight counterfeit money orders in violation of 18 U.S.C. § 2314 and § 2. Specifically, Braverman and his girlfriend, Nuncia Miranda, while in Rio de Janeiro, Brazil, had cashed counterfeit money orders, drawn on the Lafayette National Bank of Brooklyn, New York. Five months later, after his return to New York, Braverman was arrested by the FBI and tried and convicted in the United States District Court for the Eastern District of New York. Braverman appealed his conviction on a number of grounds. Included among the issues raised on appeal were whether or not Congress had meant the combination of 18 U.S.C. §§ 2 and 2314 to apply to acts committed solely in a foreign country but intended to have an effect in the United States and whether or not the foreign commerce clause of the United

---

**4.** The restrictive *American Banana* view of extraterritorial jurisdiction has also eroded considerably in anti-trust cases. *See, e.g., Manning-* *ton Mills v. Congoleum Corp.,* 595 F.2d 1287, 1291–92 (3d Cir.1979).

States Constitution permits Congress to punish acts done solely in a foreign country but intended to have an effect in the United States. In upholding the jurisdiction of the district court to hear this case, the circuit court ruled that

> There would seem to be no logical reason for holding that Congress intended to punish those who cause the violation of a law regulating and protecting foreign commerce only when they act within the borders of the United States or that Congress is powerless to protect foreign commerce from intentionally injurious acts, simply because those acts occur outside our borders. Braverman knew, when he cashed the money orders and gave Miranda two for the same purpose, that he was putting them into foreign commerce because, of necessity, they had to be ultimately paid in Brooklyn, New York.

376 F.2d at 251.

The decision in *Braverman* reflects earlier reasoning of Mr. Justice Holmes in *Strassheim v. Daily*, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911), a case involving the extradition of Daily from Illinois to Michigan for fraud perpetrated in Michigan by Daily, while Daily in fact was in Illinois:

> Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing a cause of harm as if he had been present at the effect, if the state should succeed in getting him within its power.

221 U.S. at 285, 31 S.Ct. at 560. *See Rivard v. United States*, 375 F.2d 882, 885 (5th Cir.1967), *cert. denied sub nom., Groleau v. United States*, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967).

Analogizing *Braverman* and *Daily* to the present case, if Ronald Goldberg had gone in person to the Royal Bank of Canada in Montreal to arrange for the wire transfer to Nassau of the funds, obtained from American Guardian through the scheme to defraud, the Government of the United States would have had an interest in prosecuting Goldberg because of the effect upon American Guardian in the United States, since it was American Guardian's money that he was sending to Nassau, and because of the effect upon foreign commerce of Goldberg's scheme. In the case before us, however, Ronald Goldberg did not, in fact, perform acts outside the United States which produced detrimental effects within it. What he did do was, from the Graterford Prison in Pennsylvania, cause innocent persons in foreign countries to transmit communications by wire, which transmissions put into effect his scheme to defraud. He became the "cause of harm" in this country, not through direct acts in Canada which would harm the American financial institutions upon which he drew worthless checks, but through causing, from his prison cell in Pennsylvania, innocent persons in Canada to commit the acts which put his fraudulent scheme into effect.

The *Braverman* case has demonstrated that 18 U.S.C. § 2314, in conjunction with § 2, gives jurisdiction to our courts over the offense of causing the transportation of stolen goods in foreign commerce when the offender brings about the entry into commerce in a foreign country of counterfeit money orders with the intent of affecting a bank in the United States.[5] If we vary the factual situation to that of this case: that the causative act is committed in this country by a person, who has the intent to bring about an effect in this country, by causing an innocent person in a foreign country to place stolen money into foreign commerce; this change in the facts does not take away from the reasons for which the court in *Braverman* granted jurisdiction to our courts. Indeed, there is greater justification in this case than there was in *Braverman* for granting jurisdiction of this § 2/§ 2314 offense to our courts. In this case, Ronald Goldberg, the perpetrator of the fraud, the "principal" as

---

**5.** The "causes to be transported" language in § 2314, as well as in numerous other sections of the United States Code, was dropped at the time of the enactment of § 2(b):

Section 2(b) is added to permit the deletion from many sections throughout the revision of such phrases as "causes or procures". 18 U.S.C. § 2 *Revision Notes.*

defined in 18 U.S.C. § 2(b), was a citizen of this country who was located in this country when he caused the offense to be committed. We have, therefore, in addition to the effect created in this country by the offense, two additional reasons for the United States to exercise jurisdiction over the offender: the need for a nation to protect against the injurious effect upon its citizens and upon commerce, when this effect is intentionally caused by the misdeeds of its own citizens and/or by the conduct of those persons found within its borders. *See, e.g.,* Blakesley, *A Conceptual Framework for Extradition and Jurisdiction Over Extraterritorial Crime,* 1984 Utah L.Rev. 685–719. Berge, *Criminal Jurisdiction and the Territorial Principle,* 30 Michigan L.Rev. 238 (1931).

As we have demonstrated above, therefore, the justification exists for the exercise by the United States of jurisdiction over the Section 2314, transportation of stolen money in foreign commerce offense, charged in Count Six of the Indictment. The language of § 2314 does include "foreign commerce" and "intentional effect" upon foreign commerce was shown at trial in the testimony concerning the misdeeds of defendant Goldberg. Moreover, the "causing" by Goldberg in Pennsylvania of the actions by innocent persons in Canada has been sufficiently pleaded by the joining of § 2 to the § 2314 offense.

■ Defendant Goldberg also argues in his appeal that the district court did not have jurisdiction of Count Five because it charged a wire communication between two foreign cities, Montreal and Nassau, and not between the United States and a foreign country. We do not need, however, in this case to consider whether or not the reasoning behind our decision to uphold jurisdiction of the § 2314 offense in Count

Six should also apply to the § 1343 wire fraud offense in Count Five. The reason for this is that the language of Count Five adequately charges wire fraud communication by defendant Goldberg in the telephone calls he made from Graterford Prison to the Royal Bank of Canada in Montreal, which calls caused the bank to transfer the funds to Nassau on November 13, 1984.[6] Evidence of these telephone calls by Goldberg to Montreal was introduced by the Government at trial. In his summation at the close of the trial, the attorney for the defendant argued that Count Five did not charge the telephone calls from Graterford to Montreal, but charged instead the wire transmission from Montreal to Nassau. It is evident, however, from the statements made by the trial judge, that he was considering the Graterford-Montreal calls by defendant in coming to his decision to convict on Count Five:

> THE COURT: Well, Mr. Goldberg, according to the evidence, placed calls from the United States to Canada giving specific directions for the transfer of monies to the Bahamas.
>
> MR. CARROLL: That's true. And they would make good counts. In other words, if the telephone calls from the Eastern District into Canada were charged as the offense, that would make it a solid theory because that truly would be foreign commerce.
>
> THE COURT: Well, isn't that what is charged in count six [sic]?
>
> MR. CARROLL: No.
>
> THE COURT: I mean count five....
>
> THE COURT: Count five [is] easy.

Appendix at A 141–142.

In view of the fact that the language of Count Five sufficiently charges the Graterford-Montreal telephone calls, that the Government proved these calls occurred,

---

**6.** Count Five states:

> 1. Paragraphs 1 through 10 of Count One are incorporated herein by reference.
> 2. On or about November 13, 1984,
>
> RONALD J. GOLDBERG
>
> in the Eastern District of Pennsylvania, for the purpose of executing the scheme and artifice and attempting so to do, caused to be transferred by means of wire communication

in foreign commerce certain signals and sounds, that is, defendant caused the Royal Bank of Canada, Montreal, Canada, to wire transfer funds in an amount in excess of $190,000.00 to an account in the name of RONALD J. GOLDBERG at the Royal Bank of Canada, Nassau, Bahamas.

> In violation of Title 18, United States Code, Sections 1343 and 2.

and that the court appeared to have had these calls in mind as the basis of the offense charged in Count Five, there was clearly jurisdiction of this count, even under the defendant's interpretation of "foreign commerce." [7]

## VENUE

Appellant Goldberg contends that venue was improper as to all counts of the indictment because none of the wire transfers charged therein occurred in the Eastern District of Pennsylvania. The question of venue is not simply a matter of legal procedure but raises significant issues of public policy. The venue provisions of the Constitution are important safeguards, protecting an accused from unfairness and hardship in defending against prosecution by the federal government. *Travis v. United States*, 364 U.S. 631, 634, 81 S.Ct. 358, 360, 5 L.Ed.2d 340 (1961); *United States v. Passodelis*, 615 F.2d 975, 977 (3d Cir.1980).

In this case, defendant Goldberg is accused under 18 U.S.C. § 2(b) of causing the commission of the offenses of wire fraud, under 18 U.S.C. § 1343, and interstate and foreign transportation of fraudulently obtained money, under 18 U.S.C. § 2314. Both sections 1343 and 2314 are continuing offense crimes pursuant to 18 U.S.C. § 3237 so that venue is proper in any district in which the offenses were begun, continued, or completed.

Goldberg does not deny that § 3237 is applicable, but claims that venue is still improper because the offenses charged did not begin, continue or end in the Eastern District of Pennsylvania. However, it is clear from the record, and Goldberg even seems to concede as much in his brief, that the wire transfer of funds from New York to Wilmington (Counts One and Two) passed through the Federal Reserve Bank

in Philadelphia. Consequently, there is no doubt under § 3237 that venue was proper as to Counts One and Two.

As far as Count Five is concerned, in view of our ruling that it is the Pennsylvania to Montreal telephone calls for which the defendant was convicted under this count, there is also clearly venue in the Eastern District of Pennsylvania since that is where the calls originated.

The question of venue for Counts Three, Four and Six is more difficult because the charged transmission and transportation themselves did not begin or end in or pass through the Eastern District. Goldberg argues that, following the rule established in *Kreuter v. United States*, 218 F.2d 532 (5th Cir.1955) and *United States v. Hoffa*, 205 F.Supp. 710 (S.D.Fla. 1962), venue is not proper in the Eastern District of Pennsylvania because it was merely the district where Goldberg hatched his scheme, and because neither the use of the wires nor the transportation of the money charged in these counts began, continued or ended there.

The *Kreuter* and *Hoffa* cases are not, however, situations like the present one, in which the § 2(b) principal, and he alone, the only wrongful actor in his scheme to defraud, from one location was causing innocent persons to effectuate his scheme. We grant that Goldberg did conceive of this scheme in the Eastern District; but he then from the same confines of the Graterford Prison performed all the acts necessary to accomplish it. To permit his prosecution in the district where he executed the measures which caused the offenses to be consummated would not seem contrary in any way to constitutional or statutory venue requirements.

---

**7.** The dissent finds the language of Count Five does not charge, as the offense, the telephone calls made by Goldberg from Graterford Prison to the Royal Bank of Canada in Montreal. We agree that perhaps the language of the indictment is not as precise or as artful as could be desired. However, we note that Count Five specifically incorporates paragraphs 1 through 10 of Count One "by reference." When these

paragraphs of Count One are considered with Count Five, the indictment and the proof are proper. The indictment sufficiently informed the defendant of the charges against him to permit him to prepare his defense and to protect him from another prosecution for the same offense. *See Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

[W]here the acts constituting the crime and the nature of the crime charged implicate more than one location, the constitution does not command a single exclusive venue. The constitution requires only that the venue chosen be determined from the nature of the crime charged as well as from the location of the act or acts constituting it, and that it not be contrary to an explicit policy underlying venue law.

*United States v. Reed,* 773 F.2d 477, 480 (2d Cir.1985).

[A] review of relevant authorities demonstrates that there is no single defined policy or mechanical test to determine constitutional venue. Rather, the test is best described as a substantial contacts rule that takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact finding ...

*Id.* at 481.

In the present case, in which the defendant was charged under 18 U.S.C. § 2(b) with causing violations of §§ 1343 and 2314; in which all the causative acts were performed by him in the Eastern District of Pennsylvania; in which many of the witnesses, testifying about the scheme, were located in the Eastern District of Pennsylvania; and in which American Guardian, the victim suffering loss from the scheme, was located in the Eastern District of Pennsylvania, it is consistent with Article III, § 2 of the United States Constitution, (Trial shall be held in the State where said crimes shall have been committed) and with the Sixth Amendment (right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed) to permit prosecution of this case in the Eastern District of Pennsylvania. Moreover, in joining the § 1343 and § 2314 charges with § 2(b), it would not violate the provisions of § 3237 to permit venue to lie where the § 2(b) principal performed all causative acts. Section 2(b), in making Goldberg the principal, recognizes the common law rule that the acts, which Goldberg caused to be performed by innocent persons, are legally his acts. *United States v. Giles,* 300 U.S. 41, 48, 57 S.Ct. 340, 344, 81 L.Ed. 493 (1937). If the act of beginning the transmission or the transportation is legally the act of the principal, Goldberg, then it follows that venue lies in the district in which he was located when he caused that act to be performed. *See United States v. Spiro,* 385 F.2d 210 (7th Cir.1967).

For the above reasons, therefore, the trial court properly ruled that venue was proper for all counts.

## TRANSFERS BY WIRE

■ Finally, Goldberg asserts that the interstate and foreign transportation of money by wire, charged in Counts Two, Four and Six, cannot be violations of 18 U.S.C. § 2314 because that section only applies to the interstate and foreign transportation of *tangible* items, not electronic debiting and crediting. Unfortunately for appellant, not only does case law run counter to this position, but it strikes this Court as a very narrow and unrealistic interpretation of § 2314. It is a fact of life in today's highly computerized and technological society that transfers of money between accounts are generally accomplished electronically. It is difficult to imagine a bank, that is directed by a customer to transfer $190,000 from the customer's account in Wilmington to another account in Canada, doing it any other way than electronically. Does one take cash out of the first account, load it onto a truck and transport it to the bank in Canada? Obviously not. Nor do we believe that Congress could have intended § 2314 to apply only when stolen monies are physically transported from one location to another.

Two Circuits have addressed this issue and both have found that electronic transfers of money are covered by § 2314. *United States v. Wright,* 791 F.2d 133 (10th Cir.1986); *United States v. Gilboe,* 684 F.2d 235 (2d Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983). The Tenth Circuit stated that:

The gravaman of the crime, as previously noted, is the movement of illegally obtained money from one locale to another. That money changes form during the process, if that is indeed the fact, is insignificant. What is significant is, when the transaction is completed, money exists at the final destination.

*Wright*, 791 F.2d at 136.

The Second Circuit in an earlier opinion made similar observations:

Electronic signals in this context are the means by which funds are transported. The beginning of the transaction is money in one account and the ending is money in another. The manner in which the funds were moved does not affect the ability to obtain tangible paper dollars or a bank check from the receiving account. Indeed, we suspect that actual dollars rarely move between banks, particularly in international transactions.

*Gilboe*, 684 F.2d at 238.

We agree with the reasoning of the Second and Tenth Circuits on this issue and hold that electronic transfers of money are covered by section 2314.

## CONCLUSION

For the reasons stated above, we find that the Eastern District of Pennsylvania did have jurisdiction of Counts Five and Six, and venue on all counts properly lay in that district. In addition, defendant Goldberg was properly charged under 18 U.S.C. § 2314 in Counts Two, Four and Six for causing the interstate and foreign transportation of money, obtained by fraud, even though that transportation was performed electronically. We will affirm appellant Goldberg's conviction on all counts.

SLOVITER, Circuit Judge, dissenting in part and concurring in part.

I join the Venue portion of the majority's opinion and their affirmance of Goldberg's convictions under Counts One through Four. I dissent from the Jurisdiction portion of the opinion. I believe that under the only reasonable reading of the indictment and the relevant statutory language,

the convictions under Counts Five and Six must be reversed.

Count Six charges the transportation "from the Royal Bank of Canada, Montreal, Canada, to the Royal Bank of Canada, Nassau, Bahamas, knowing the same to have been taken by fraud" in violation of 18 U.S.C. §§ 2314 and 2. App. at 165. The majority affirms the conviction under Count Six on the basis of cases that extend the jurisdiction of the United States to include offenses, wholly committed outside this country, if the acts committed were intended to have an effect in this country. However, the issue before us is not whether the United States can extend its jurisdiction to the transportation between two foreign countries of funds that were stolen in the United States, but whether the United States has done so in 18 U.S.C. § 2314. Since the definition of foreign commerce for purposes of Title 18 refers only to "commerce *with* a foreign country," 18 U.S.C. § 10 (emphasis added), it is patently not as all-encompassing as it could be. At this time, however, it is the only definition Congress has chosen to enact, and it simply does not cover commerce *between* foreign countries.

*United States v. Bowman*, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922), upon which the majority rely, addresses the question whether a federal criminal statute may be applied extraterritorially where Congress has "not specifically defined" the locus of the crime. In that situation, a court seeking to ascertain Congress' intent must look to "the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations." *Id.* at 97–98, 435 S.Ct. at 41. *See also United States v. Wright-Barker*, 784 F.2d 161, 167 (3d Cir.1986). Unlike the *Bowman* situation, Congress has defined "foreign commerce" as applied to section 2314, and therefore *Bowman* provides little assistance here.

The relevant legislative history clearly precludes the application of section 2314 to the transportation of stolen money between two foreign countries. Section 10 first appeared in the 1948 recodification of Title 18 of the United States Code, Pub.L. No. 80–

772, § 10, 62 Stat. 683, 686 (1948), and the Revisor's Notes to that section state that it "consolidates into one section identical definitions contained in sections 408, 408b, 414(a) and 419a(b) of title 18, U.S.C., 1940 ed." These provisions, one of which was a provision of the National Stolen Property Act containing the predecessor to section 2314, all defined "interstate or foreign commerce" to include:

> transportation from one State, Territory, or the District of Columbia, to another State, Territory, or the District of Columbia, or to a foreign country, or from a foreign country to any State, Territory, or the District of Columbia.

The Revisor's Notes refer to "slight improvements in style" in the recodified version. However, there is no indication that Congress intended to broaden the definition of "foreign commerce" to include transactions that do not begin or end in the United States.

*United States v. Braverman,* 376 F.2d 249 (2d Cir.), *cert. denied,* 389 U.S. 885, 88 S.Ct. 155, 19 L.Ed.2d 182 (1967), upon which the majority also rely, is in no way inconsistent with the definition of "foreign commerce" as only including transactions that begin or end in the United States. In that case, the court stated that "Braverman knew, when he cashed the money orders and gave Miranda two for the same purpose, that he was putting them in foreign commerce [in Brazil] because, of necessity, they had to be ultimately paid in Brooklyn, New York." 376 F.2d at 251. Here, the transaction charged in Count Six between foreign countries did not begin or end in the United States. While the Canada bank may have had some recourse against the Wilmington Trust Company, the possibility of such recourse cannot alter the nature of the transaction that is charged in Count Six, particularly since Goldberg was charged in Count Four with a violation of sections 2314 and 2 for the transportation between the Wilmington bank and the Canada bank.

Nor do I believe that Goldberg's conviction under Count Six can be upheld by application of 18 U.S.C. § 2(b). That provision states that a person who "willfully causes an act to be done which if directly performed by him or another would be an offense" is punishable as a principal. However, if the transportation charged would not be an offense because it is not in "foreign commerce" as defined in 18 U.S.C. § 10, then the fact that the transportation is willfully caused by a person acting inside the United States cannot change the nature of the transportation.

For similar reasons, I believe that the majority also err in upholding Goldberg's conviction under Count Five, which charges a violation of 18 U.S.C. § 1343, prohibiting wire transmissions "in ... foreign commerce" for the purpose of executing a fraudulent scheme.[1] The majority circumvent the "foreign commerce" issue presented by the Montreal to Nassau wire by reading Count Five of the indictment as charging that Goldberg made telephone calls from Graterford Prison to Montreal in furtherance of the scheme to defraud. The majority are plainly in error.

Count Five charges that Goldberg, for the purposes of executing the fraudulent scheme, "caused to be transferred by means of wire communication in foreign commerce certain signal[s] and sounds, that is, defendant caused the Royal Bank of Canada, Montreal, Canada, to wire transfer funds in an amount in excess of $190,000.00 to an account in the name of RONALD J. GOLDBERG at the Royal Bank of Canada, Nassau, Bahamas." App. at 164. The offense charged is clearly based on the wire communication between Montreal and Nassau. The telephone calls relied on by the majority are not referred to anywhere in the indictment. For that reason, the incorporation "by reference" language of Count Five, referred to by the majority at note 7 of their opinion, cannot possibly supply the nonexistent allegation.

---

1. In 1956, the Wire Fraud statute, 18 U.S.C. § 1343, was amended to include transmissions "in ... foreign commerce." Pub.L. No. 84–688, 70 Stat. 523 (1956). Significantly, the examples in the legislative history of "foreign commerce" to which the amended provision was to apply all included transmissions between a foreign country and the United States. *See* S.Rep. No. 1873, 84th Cong.2d Sess. 2–3 (1956); H.R.Rep. No. 2385, 84th Cong. 2d Sess. 1–2 (1956).

Finally, the Graterford-Montreal calls cannot be considered to be properly charged by the allegation in the indictment that Goldberg "caused" the wire transfer of funds from Montreal to Nassau. The evidence at trial showing that Goldberg in fact caused the wire transmission in part by means of various telephone calls from Graterford to Montreal and the district court's reliance on those calls cannot alter the undeniable fact that the indictment does not charge that the offense was the telephone communication. The means of the communication is the essence of the offense under 18 U.S.C. § 1343, and fraud effected by the wire communication from Montreal to Nassau, not fraud effected by telephone communication from Graterford to Montreal, was what was charged. To permit the conviction of Goldberg on Count Five on the basis of telephone calls that were never charged or alluded to in the indictment is contrary to our cases holding the purpose of an indictment is, *inter alia,* to apprise the defendant of the charge. *See United States v. Crocker,* 568 F.2d 1049, 1059–60 (3d Cir.1977); *United States v. Goldstein,* 502 F.2d 526, 529 (3d Cir. 1974) (in banc).

For the foregoing reasons, I would reverse the convictions of Goldberg under Counts Five and Six.